883 F.2d 594
 1989-2 Trade Cases 68,806
 William R. FISCHER, The Estate of Betty L. Fischer, Montford
R. Fischer and Bonita G. Fischer, Appellants,
v.
NWA, INC.; Northwest Airlines, Inc.; and Simmons Airlines,
Inc., Appellees.
 No. 88-5258.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 13, 1989.
Decided Aug. 17, 1989.
Rehearing and Rehearing En Banc Denied Oct. 18, 1989.
 
 Daniel R. Shulman, Minneapolis, Minn., for appellants.
 Frank J. Costello, Washington, D.C., for NWA.
 Robert G. Foster, Chicago, Ill., for Simmons Airlines.
 Before WOLLMAN and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.
 MAGILL, Circuit Judge.
 
 
 1
 Appellants William R. Fischer, et al., are former stockholders in Fischer Bros. Aviation (Fischer), an airline that provided regional connecting flight service for Northwest Airlines, Inc. (Northwest) at Detroit. In the district court,[1] Fischer asserted antitrust and common-law claims against Northwest and Simmons Airlines, Inc. (Simmons). The allegedly unlawful conduct by Northwest and Simmons stemmed from Northwest's 1987 acquisition of Republic Airlines, Inc. (Republic). Under a contract much like the Northwest/Fischer agreement, Simmons had provided connecting flight service for Republic at Detroit. Northwest and Simmons moved for, and the district court granted, summary judgment on all issues. On appeal, Fischer argues that the court erred in concluding that:
 
 
 2
 (1) Fischer could not challenge the Northwest/Republic combination because the U.S. Department of Transportation, by approving the acquisition, immunized it against future antitrust challenges;
 
 
 3
 (2) Fischer failed to present sufficient evidence of a Northwest/Simmons conspiracy to terminate Fischer; and
 
 
 4
 (3) because Fischer failed to seek redress under the mandatory arbitration clause in the Northwest/Fischer contract, all of Fischer's common-law claims are time-barred.
 
 
 5
 Having considered the district court's summary judgment order and the record on appeal, we affirm.
 
 I.
 
 6
 On December 23, 1985, one month before the Northwest/Republic merger, Northwest and Fischer signed a regional airline service agreement.[2] The agreement provided that:
 
 
 7
 (1) Beginning February 1, 1986, Fischer would provide regional connecting flights from Detroit as a Northwest airlink. In other words, Northwest, a national airline, would provide flights between Detroit and other major cities. Then, Fischer, under the Northwest name, logo, etc., would provide connecting flights to smaller cities surrounding the Detroit metropolitan area.
 
 
 8
 (2) Fischer would act as Northwest's exclusive regional airline for all flights originating in Detroit unless Fischer declined to serve a particular route.
 
 
 9
 (3) Northwest would partially subsidize Fischer's operation, in accordance with a prorated formula.
 
 
 10
 (4) Either party could terminate the agreement unilaterally, with or without cause, after providing six months notice.
 
 
 11
 (5) The sole mechanism for resolving disputes arising from the agreement would be arbitration.
 
 
 12
 The Northwest/Fischer agreement remained in effect for only thirteen months (February 1986-March 1987). It was terminated because of ramifications of Northwest's acquisition of Republic.
 
 
 13
 Northwest began to consider acquiring Republic in 1985. On January 23, 1986, one month after the Northwest/Fischer agreement was signed, Northwest and Republic announced publicly that Northwest intended to acquire Republic, if the transaction were approved by the U.S. Department of Transportation.
 
 
 14
 The planned acquisition created considerable friction in the Northwest/Fischer relationship because Republic also had an ongoing exclusive regional airline service contract for flights originating in Detroit. Republic and Simmons had an agreement, executed on December 26, 1984, similar to that between Northwest and Fischer. Inter alia, it provided that Simmons would be Republic's exclusive regional airline at Detroit unless Simmons declined to serve a particular route. Unlike the Northwest/Fischer agreement, however, the Republic/Simmons agreement had no subsidization arrangement and was not terminable at will with six months notice; rather, it stipulated that neither party could terminate it until October 1988. The two regional service contracts gave rise to a dilemma for the newly-created Northwest/Republic combination. The combination was saddled with two unequivocal, ongoing regional service contracts granting overlapping "exclusive" status to Fischer and Simmons for the Detroit regional market.[3]
 
 
 15
 On August 12, 1986, the Department of Transportation approved Northwest's acquisition of Republic. Although the acquisition patently created a conflict between the Fischer and Simmons regional service agreements, Northwest confidently predicted that a compromise would be reached, accommodating the contractual rights of both regional carriers and permitting them to share the Detroit market. However, shortly after the acquisition received government approval, both of the regional airlines wrote to Northwest, indicating that they intended to enforce the exclusive rights provisions in their contracts.
 
 
 16
 In August 1986, Northwest convened Fischer and Simmons for a meeting in Minneapolis. Northwest encouraged them to carve out a mutually acceptable division of the Detroit market, stressing that although it wished to encourage negotiations leading to an acceptable compromise, it would limit itself to indirect involvement, leaving substantive negotiations to the two regional carriers.
 
 
 17
 The meeting was a failure. No agreement concerning division of the market was reached. Simmons then insisted that Northwest "write a check" for any routes Simmons was forced to surrender to Fischer. When Northwest refused to make such payments, Simmons asked Northwest if it would object if Simmons acquired Fischer. Northwest did not object, but efforts to create a Simmons/Fischer combination also failed.
 
 
 18
 Pursuant to its December 23, 1985 regional service contract with Fischer, Northwest sent notice of termination to Fischer on September 24, 1986. Prior to that date, numerous efforts to resolve the Fischer/Simmons conflict had failed. After the August meeting in Minneapolis, the parties' principals had several meetings and telephone conversations, and exchanged assorted correspondence. When Northwest sent notice of termination to Fischer, Simmons revoked its offer to purchase Fischer. Northwest then informed Fischer that Simmons was the permanent Northwest regional service airline in Detroit and therefore it would have the right of first refusal for all regional Northwest flights from Detroit. Simmons began to serve as Northwest's regional airlink in Detroit on October 1, 1986. Until February 4, 1987, Northwest continued to negotiate toward a new agreement that would accommodate Fischer.[4] On that date, negotiations ended as Northwest learned that Fischer had retained an attorney and was preparing to sue Northwest for violating their 1985 agreement. On March 24, 1987, six months after Northwest provided Fischer's notice of termination, Fischer was terminated by Northwest. Later that year, Fischer (which, ironically, had enjoyed a 30% increase in passengers since Northwest's acquisition of Republic) was sold to Midway Airlines.
 
 
 19
 Although the 1985 Northwest/Fischer agreement, see supra, provided for arbitration of all disputes, controversies and claims arising from or related to the agreement, Fischer never sought arbitration of its grievances stemming from Northwest's acquisition of Republic. Instead, Fischer filed a lawsuit in the district court, asserting nine antitrust and common-law claims against Northwest, Simmons, or both. In its antitrust claims under the Sherman Act, Fischer asserted that:
 
 
 20
 (1) the acquisition of Republic was an unlawful contract or combination restraining trade in violation of Section 1;
 
 
 21
 (2) the acquisition of Republic attempted to or did create a monopoly in violation of Section 2;
 
 
 22
 (3) Northwest and Simmons conspired to restrain trade in violation of Section 1; and
 
 
 23
 (4) Northwest and Simmons conspired to monopolize or attempt to monopolize the Detroit regional connecting service airline market in violation of Section 2.
 
 
 24
 In its common-law claims, Fischer argued that:
 
 
 25
 (1) Simmons tortiously interfered with the Fischer/Northwest contract;
 
 
 26
 (2) Simmons and Northwest conspired to interfere with Fischer's "prospective advantage;"
 
 
 27
 (3) Northwest fraudulently misrepresented its intention to perform its obligations under the Fischer/Northwest contract;
 
 
 28
 (4) Northwest breached its contract with Fischer by failing to comply with the exclusivity clause; and
 
 
 29
 (5) Northwest breached the covenant of good faith and fair dealing implied in the contract.
 
 
 30
 Northwest and Simmons moved for summary judgment on all claims. The court granted the motion and dismissed the entire action, holding that (1) Fischer's antitrust challenge to the acquisition of Republic was barred by the Department of Transportation's approval of the transaction; (2) Fischer failed to present sufficient evidence of a conspiracy to support allegations of an antitrust violation; and (3) Fischer's common-law claims were subject to the arbitration provision, and since no request for arbitration was made by Fischer within 120 days of the alleged breach of contract, the claims were time-barred.
 
 
 31
 We affirm the district court's granting of the defendants' motion for summary judgment. However, we find in favor of the defendants on partially different grounds.[5] We hold that:(1) Summary judgment dismissing Fischer's antitrust claims was properly granted because Fischer failed to establish that it suffered an antitrust injury; and
 
 
 32
 (2) Summary judgment dismissing Fischer's common-law claims was properly granted because Fischer failed to seek arbitration.
 
 II.
 
 33
 As the district court noted, the Supreme Court has recently "refined [the] application" of the standard for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.[6] See Fischer v. NWA, No. 3-87-CIV-106, slip op. at 6 (D.Minn. June 9, 1988). In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court presented a thorough restatement of the summary judgment standard. Anderson emphasizes that "[o]nly disputes over facts that might affect the outcome of the suit * * * will properly preclude the entry of summary judgment." Id. at 248, 106 S.Ct. at 2510. Further, it held that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48, 106 S.Ct. at 2509-10. The Court then goes on to point out that the Rule 56 standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id. at 250, 106 S.Ct. at 2511 (citing Brady v. Southern R. Co., 320 U.S. 476, 479-80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943)). In this circuit, we have held that a district court must give the nonmoving party the benefit of all the reasonable inferences that can be drawn from the underlying facts. Trnka v. Elanco Products, 709 F.2d 1223 (8th Cir.1983).
 
 III.
 
 34
 Moving to the substantive issues in this case, we begin with Fischer's antitrust claims. Fischer contends that Northwest's acquisition of Republic and the course of dealings between Northwest and Republic since the acquisition have violated Sections 1 and 2 of the Sherman Act. Specifically, Fischer alleges that since the acquisition, the appellees, together or separately, have conspired to restrain trade, conspired to monopolize the Detroit regional airline market, entered into an unlawful contract or combination in restraint of trade, and attempted to create a monopoly. The district court, stressing the government's approval of the acquisition and Fischer's failure to present sufficient evidence of conspiratorial action to raise a genuine fact issue, granted summary judgment in favor of Northwest and Simmons. We affirm the district court. However, we do so on different grounds: the failure of Fischer to establish that it suffered an antitrust injury as a result of Northwest's acquisition of Republic.
 
 
 35
 In order to prevail under the Sherman and Clayton Acts, plaintiffs must carry a heavy burden of proof. In Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court stated that antitrust plaintiffs:
 
 
 36
 must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.
 
 
 37
 Id. at 489, 97 S.Ct. at 697.
 
 
 38
 In McDonald v. Johnson & Johnson, 722 F.2d 1370 (8th Cir.1983), this court offered the following explanation of the antitrust injury requirement: "it is insufficient for plaintiffs to simply assert that plaintiffs' damages would not have been incurred without [the alleged anticompetitive conduct]." Id. at 1374. Rather, the plaintiff must establish that "there was * * * proximate causation between plaintiff's harm and the alleged illegal market restraint." Id. Unless it can establish that its alleged injury was caused by conduct that violates the antitrust laws, a plaintiff lacks standing, under Section 4 of the Clayton Act, to bring an antitrust lawsuit.[7] The threshold requirement of an antitrust injury reflects the Supreme Court's frequently stated maxim that Congress enacted the antitrust laws to protect competition, not competitors. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. at 488, 97 S.Ct. at 697 (1977) (citing Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).
 
 
 39
 Our review of the record convinces us that Fischer failed to prove that it has suffered an antitrust injury. Fischer does not contend that it was a customer of Northwest forced to pay increased prices. Nor was Fischer a competitor injured by Northwest's acquisition of monopoly power (roughly 75% of the Detroit market). Rather, Fischer asserts that it suffered damage when it was terminated as Northwest's exclusive regional carrier in Detroit. We conclude that Fischer's termination was not caused by anticompetitive conduct or an anticompetitive effect of such conduct; rather, it was caused by Northwest's need to avoid employing two regional airlines where only one was required. We are convinced that even in a city in which Northwest had far less than monopoly power, it would have been reluctant to waste resources on overlapping contractual agreements providing twice the regional connecting flight service required.
 
 
 40
 Furthermore, it is not disputed that the original Northwest/Fischer agreement, see supra p. 597, gave both sides power to terminate the agreement at will with six months notice. Northwest did not act in an anticompetitive manner when it chose to exercise that termination power. Indeed, Northwest's termination power was in no way enhanced by the acquisition of Republic or any anticompetitive effects it may have engendered. Therefore, we hold that because Fischer suffered no antitrust injury, it lacked standing as an antitrust plaintiff under Section 4 of the Clayton Act. Hence, the district court did not err in granting summary judgment for Northwest on all of Fischer's antitrust claims.
 
 IV.
 
 41
 Finally, we move to Fischer's common-law claims.[8] Northwest gave Fischer six months notice of termination on September 24, 1986. Therefore, Fischer apparently was entitled to retain its status as Northwest's exclusive regional airlink in Detroit until the termination date: March 24, 1987. However, Simmons began to provide connecting service as a Northwest airlink on October 1, 1986. Fischer's objections to Northwest's and Simmons' apparent violation of Fischer's contractual right to remain Northwest's exclusive regional airlink in Detroit through the entire termination notice period gave rise to Fischer's common-law claims in the district court. The court dismissed three of Fischer's common-law claims (fraud, tortious interference with contract, and tortious interference with prospective advantage) on substantive grounds. The court also dismissed all of the common-law claims on the grounds that they were time-barred by the arbitration clause in the 1985 agreement between Fischer and Northwest.
 
 
 42
 Fischer never sought arbitration of its grievances against Northwest and Simmons. It ignored the arbitration clause, choosing instead to file the instant lawsuit.[9] Nevertheless, Fischer contends on appeal that despite its failure to seek arbitration, the district court was incorrect to conclude that its common-law claims are barred by the mandatory arbitration clause. We disagree and affirm the district court's holding concerning Fischer's common-law claims.
 
 
 43
 The disputed arbitration clause provided that:
 
 
 44
 Any dispute, controversy or claim between the Parties, as to which there are no other necessary or indispensable parties, arising out of or relating to this Agreement, including its breach, or the transactions contemplated by this Agreement, which cannot be resolved amicably by the Parties, shall be referred to arbitration within 120 days of the date the alleged breach occurred. [Emphasis added].
 
 
 45
 Fischer concedes that the arbitration clause is mandatory. It also concedes that the clause is not too narrow in scope to encompass its claims against Northwest and Simmons. Instead of challenging the validity or scope of the clause, Fischer submits three arguments suggesting that the clause is inapplicable to its common-law claims because of factual circumstances surrounding its dealings with Northwest and Simmons. First, Fischer argues that by continuing to negotiate with Fischer for more than 120 days after its breach of the 1985 agreement, Northwest enticed Fischer into forfeiting its ability to act under the mandatory arbitration clause. In essence, Fischer argues that compliance with the terms of the arbitration clause became impossible because of Northwest's actions. We find this argument meritless. After the alleged breach of contract, Northwest continued to negotiate toward a new agreement with Fischer, not to salvage the 1985 agreement. Northwest had no power to prevent Fischer from seeking arbitration to settle the dispute over the alleged breach of the original agreement. Further, it strikes us as disingenuous for Fischer, after maneuvering as though it were not bound by a mandatory arbitration clause (Fischer has never sought arbitration of its grievances under the 1985 agreement), to rely on a post hoc argument that the appellees prevented it from seeking arbitration.
 
 
 46
 Fischer also argues that the arbitration clause is inapplicable because Simmons was a necessary or indispensable party. Again, we disagree. In Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc., 564 F.2d 816, 820 (8th Cir.1977), the Eighth Circuit held that "a person does not become indispensable to an action to determine rights under a contract simply because that person's rights or obligations under an entirely separate contract will be affected by the result of the action." We agree with the district court that the reasoning in Helzberg directly applies to this case. The contract at issue involves only Northwest and Fischer, not Simmons.
 
 
 47
 Third, Fischer contends that because of its conduct, Northwest waived its right to enforce the arbitration clause. However, since Northwest is not the aggrieved party in this case, it had no duty to enforce the mandatory arbitration clause. The clause plainly states that "[a]ny dispute, controversy or claim between the parties * * * arising out of or relating to this Agreement, including its breach, * * * shall be referred to arbitration within 120 days of the date the alleged breach occurred." Fischer believed that a breach had occurred, yet it failed to seek arbitration, opting instead to litigate its claims. The arbitration clause in the 1985 Northwest/Fischer agreement clearly makes arbitration the sole dispute resolution mechanism agreed upon by the parties. Since Fischer failed to seek arbitration at any time, we affirm the district court's holding that Fischer's common-law claims are time-barred.
 
 
 48
 For all the foregoing reasons, we affirm the district court's summary judgment order.
 
 
 49
 LARSON, Senior District Judge, concurring and dissenting.
 
 
 50
 I agree with the majority that plaintiff's common law claims against defendant Northwest for fraud, breach of contract, and breach of the implied covenant of good faith and fair dealing are barred by the mandatory arbitration clause in the contract between plaintiff and Northwest. I respectfully dissent from the majority's decision affirming the dismissal of plaintiff's antitrust claims and its common law claims against Simmons.
 
 
 51
 In 1985, defendant Northwest and Republic Airlines were competing national airlines operating "hubs" at the Detroit and Minneapolis/St. Paul airports.[1] Defendant Simmons was a regional air carrier providing service from Detroit and Chicago, and had just begun serving as a Republic Express commuter carrier out of Detroit.[2] Plaintiff Fischer Bros. was a regional air carrier providing service to various cities in Ohio and Michigan and operating as a regional airline of US Air.
 
 
 52
 On December 23, 1985, Fischer Bros. discontinued its affiliation with US Air and entered into a five year agreement to provide commuter service for Northwest. As a Northwest Airlink, Fischer Bros. was in competition with Simmons, operating as Republic Express, in markets from Detroit to Traverse City, Lansing, and Flint, Michigan, and from Detroit to Cleveland and Columbus, Ohio. In January, 1986, Northwest and Republic executed an agreement and plan of merger, subject to approval by the Department of Transportation (DOT). Northwest informed the commuter carriers, including Fischer Bros., that they would continue to "play a major role" and would have expanded opportunities as Northwest commuter carriers after the merger.
 
 
 53
 No airline opposed the merger in administrative hearings before the DOT,[3] but the Antitrust Division of the United States Department of Justice did. In response to the Department of Justice's opposition, Northwest argued the merger would not reduce competition because, inter alia, the remaining airlines, including commuter carriers such as Fischer Bros., would continue to compete against the merged Northwest-Republic. The DOT concluded the proposed merger presented "some troubling issues." The Department nonetheless approved the merger on August 12, 1986, but declined to grant any antitrust immunity to the merged company.
 
 
 54
 After the merger was approved, Northwest presented to the commuter carriers a proposal for dividing up the markets in Detroit and Minneapolis/St. Paul. Both Fischer Bros. and Simmons rejected the proposal for the Detroit regional market.[4] In the ensuing weeks, Fischer Bros. made several counterproposals to Northwest, including one which contemplated continued competition, but these proposals were rejected by Simmons and/or Northwest. On September 8, George Rassmusson, who had been Republic's Director of Regional Airline Programs and who was employed after the merger by Northwest in that capacity, became involved in the negotiations. Rassmusson had worked closely with Joel Murray, Simmons' chairperson, during Rassmusson's employment at Republic and was a "drinking buddy" of Peter Piper, Simmons' Executive Vice President.
 
 
 55
 On September 11, Rassmusson met with representatives of Fischer Bros. and Simmons. After several hours of discussion, Simmons offered to purchase Fischer Bros. for $3.3 million. When the parties met to consummate the sale on September 22, however, Fischer Bros. claims Simmons changed its position and added new and unacceptable terms to the deal. Negotiations continued throughout the day with Rassmusson's participation. That evening, Rassmusson had dinner with Piper and Murray from Simmons. The following day, negotiations remained stalled. Rassmusson left, and Fischer Bros., after discussing the matter further, decided to return to Ohio to consider Simmons' proposals.
 
 
 56
 The next day, September 24, 1986, Fischer Bros. received a notice from Simmons withdrawing all offers and, within hours, also received a notice of termination from Northwest. Fischer Bros. claims its termination resulted from an agreement between Simmons and Northwest to eliminate Fischer Bros. from the market because Fischer Bros. would not agree to Simmons' terms for purchase or to Simmons' and Northwest's terms for dividing up the Detroit market.
 
 
 57
 In concluding the termination "was caused by Northwest's need to avoid employing two regional airlines where only one was required," rather than any anticompetitive conduct, see at 600, the majority fails to consider all of the evidence in the record. Northwest's own witnesses were unable to testify consistently concerning why Fischer Bros.' contract was cancelled within hours of Simmons' withdrawal of all offers. Nor did they consistently testify as to what Northwest knew at the time it terminated Fischer Bros.
 
 
 58
 Rassmusson first testified that he met with his superior, Executive Vice President of Marketing A.B. Magary, on September 24, recommended termination of Fischer Bros., and received approval from Magary, who "said that he would handle the logistics of the notification." After Magary testified that he was out of the country from September 19 until the evening of September 25, that he did not participate in the decision to cancel Fischer Bros., and that the "decision on how to handle the contracts was really pretty much left to the lawyers. The lawyer in this case being Terry Hall," Rassmusson changed his deposition testimony to say that he met on the 24th with attorney Hall and recommended termination to Hall, who approved and accepted the recommendation. Hall, however, denied that he participated in the decision to terminate Fischer Bros., and testified that his only involvement was drafting the termination notice at Rassmusson's request.
 
 
 59
 Hall also testified that when he drafted the termination notice he knew that Simmons had been negotiating with Fischer Bros., that the negotiations had broken down, and that Simmons had withdrawn its offers to purchase Fischer Bros. This knowledge could only have come from Simmons. On reading and signing his deposition, however, Hall changed his testimony to reflect only that he was aware that negotiations had "broken down," consistent with Rassmusson's testimony that it was through Fischer Bros., not Simmons, that he learned of the result of the September 23 meeting. Fischer Bros.' representatives deny having contact with Rassmusson between the time the meeting ended on the 23rd and the time they received the termination notice on the 24th, however.
 
 
 60
 These inconsistencies, coupled with the timing of the notices from Simmons and Northwest and Northwest's admitted knowledge of the status of the negotiations between Simmons and Fischer Bros., in my view create a factual dispute concerning whether Simmons and Northwest agreed to eliminate Fischer Bros. from the Detroit regional market.[5] Fischer Bros. ceased operation when Northwest's termination became effective on March 25, 1987. Its assets were sold to Midway Airlines in May, 1987, and it no longer competes in the Detroit regional market. Since March, 1985, each of the routes on which Fischer Bros. competed with Simmons is a monopoly for Northwest and/or Simmons, with the exception of Detroit-Cleveland, and service on all routes has been reduced.
 
 
 61
 Contrary to the majority, I believe these facts constitute sufficient evidence of "antitrust injury" to withstand a motion for summary judgment both with respect to plaintiff's challenge to the Northwest-Republic merger and with respect to plaintiff's claims of a conspiracy between Northwest and Simmons to restrain trade and to monopolize the Detroit regional market. I agree that in order to maintain a treble damage action under section 4 of the Clayton Act, a plaintiff must establish an injury "of the type the antitrust laws were intended to prevent ... that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); McDonald v. Johnson & Johnson, 722 F.2d 1370, 1374 (8th Cir.), modified on other grounds, 722 F.2d 1370, 1388 (8th Cir.1983), cert. denied, 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984). See generally P. Areeda & H. Hovenkamp, Antitrust Law, para. 334.2a (Supp.1988). I also agree that to be successful, an antitrust plaintiff seeking damages must establish not only harm sufficient to satisfy the constitutional standing requirement of injury in fact, but must also establish it is a proper party to bring the action based upon an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them. Associated General Contractors v. Carpenters, 459 U.S. 519, 535 & n. 31, 103 S.Ct. 897, 907 & n. 31, 74 L.Ed.2d 723 (1983); South Dakota v. Kansas City Southern Industries, Inc., 880 F.2d 40, 45-46 (8th Cir.1989); McDonald, 722 F.2d at 1373-74.
 
 
 62
 At this stage of the proceedings, however, plaintiff is entitled to all reasonable inferences from the evidence presented and need only establish a genuine issue of material fact with regard to the existence of antitrust injury. See R.C. Bigelow, Inc. v. Unilever N.V., 867 F.2d 102, 107-11 (2d Cir.1989); In re Worker's Compensation Insurance Antitrust Litigation, 867 F.2d at 1560. Examination of each of plaintiff's claims reveals sufficient evidence of injury in my view to defeat defendant's motion for summary judgment.
 
 
 63
 Assuming Fischer Bros. can prove its allegations of a conspiracy between Northwest and Simmons to eliminate Fischer Bros. as a competitor in the Detroit regional market, the injury to Fischer Bros. is direct, is accompanied by an improper motive, and is clearly the type of injury to competition which the antitrust laws were intended to prevent. Indeed, neither defendant even advanced the argument that lack of injury precluded plaintiff's conspiracy claims.
 
 
 64
 Defendant Northwest did advance the argument that Fischer Bros. lacked standing to challenge the Northwest-Republic merger, alleging Fischer Bros. had suffered only indirect injury as a result of the merger. Fischer Bros. contends it was harmed by the merger as a competitor at the Detroit "hub," because the merger gave Northwest sufficient market power at Detroit (75% of enplanements) to force Fischer Bros. from the market and to prevent its reentry. Fischer Bros. presented evidence that affiliation with a major carrier is essential to the survival of a commuter carrier, and that after the merger Northwest was essentially the only major carrier with a presence at Detroit.
 
 
 65
 In its application to the Department of Transportation in support of the merger, Northwest stated that it competed with commuter carriers such as Fischer Bros. in many domestic city pairs and argued that the merger would not foreclose competition because of the presence of these smaller carriers.[6] While a competitor may not challenge a horizontal merger on the ground that the merged entity will be better able to compete against it or on the theory that it should be entitled to monopoly profits rather than the alleged monopolist, a competitor does have standing to challenge a merger which will result in monopoly power where there is also an allegation of post-merger predatory conduct such as predatory pricing or other predatory non-price strategies. See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 120-22, 107 S.Ct. 484, 495, 93 L.Ed.2d 427 (1986); P. Areeda & H. Hovenkamp, Antitrust Law, para. 340.2 at 360-68 (Supp.1988).
 
 
 66
 In R.C. Bigelow, Inc. v. Unilever N.V., 867 F.2d 102 (2d Cir.1989), for example, the Second Circuit found a competitor had standing to challenge the merger of two herbal tea companies on the theory that the merged company, which would enjoy an 84% market share, would be likely to eliminate competition in the herbal tea market by, inter alia, reducing the plaintiff competitor's access to supermarket shelf space. Id. at 111. In Bigelow, the court even accorded plaintiff a presumption, in response to defendant's motion for summary judgment, that such anticompetitive conduct would occur. Id.
 
 
 67
 No presumption of post-merger predatory conduct is needed in this case, because Fischer Bros. alleges Northwest actually used its post-merger monopoly power to eliminate Fischer Bros. as a competitor in the Detroit regional market. The elimination of a competitor through predatory acts is "antitrust injury." Cf. Consolidated Gold Fields v. Minorco, 871 F.2d 252, 257-58 (2d Cir.1989) (finding sufficient injury to challenge takeover where plaintiff company alleged acquiring company would limit its production; reduction in competition was "precisely the type [of injury] the antitrust laws were designed to protect against").
 
 
 68
 The majority cites Northwest's ability to terminate Fischer Bros. on six months' notice, arguing Northwest would have terminated Fischer Bros. regardless of its post-merger market share because it was faced with two overlapping commuter services. But Northwest's monopoly power is precisely, according to plaintiff, why Northwest was able successfully to eliminate competition when it conspired with Simmons to eliminate Fischer Bros. as a competitor. Fischer Bros.' termination, in this case, constitutes "antitrust injury" because plaintiff has presented sufficient evidence to raise an inference that Northwest did not simply terminate Fischer Bros.; it used its market power in combination with another competitor to reduce competition at the Detroit hub. Cf. South Dakota v. Kansas City Southern Industries, Inc., 880 F.2d 40, 46, 49 (8th Cir.1989) (denying standing to State of South Dakota, which was neither competitor nor consumer of defendant's, stating "[w]ithout a doubt" that competitor had standing to raise antitrust claims).
 
 
 69
 While the majority also alludes to additional "extra-rigorous" factors relevant to a determination of the standing of a treble damage plaintiff, see note 7 supra at 599; see generally Associated General Contractors, 459 U.S. at 537-45, 103 S.Ct. at 908-12, Northwest did not rely on any of these other criteria to support the district court's judgment. Rather, Northwest argued only that Fischer Bros.' alleged injury was too "indirect." I agree with the district court's observation that this allegation alone, in the context of this case, does not provide a sound basis for granting summary judgment.
 
 
 70
 The district court also concluded, however, that Fischer Bros. was precluded from challenging the merger because of the judicial review provisions contained in section 1006(d) of the Federal Aviation Act. Northwest argues on appeal that the exclusive means of challenging the merger as a violation of the antitrust laws is through an appeal of the DOT's order approving the merger. See 49 U.S.C.App. Sec. 1486.[7]
 
 
 71
 Northwest's argument, based upon City of Tacoma v. Taxpayers, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958), fails, however, to consider the effect of the DOT's refusal to exempt the merger from the antitrust laws pursuant to section 414 of the Act. See 49 U.S.C.App. Sec. 1384. Under section 1384, the DOT, as part of its order approving transactions such as the Northwest-Republic merger,
 
 
 72
 may ... exempt any person affected by such order from the operations of the "antitrust laws" ... to the extent necessary to enable such person to proceed with the transaction specifically approved by the Board in such order and those transactions necessarily contemplated by such order, except that the Board may not exempt such person unless it determines that such exemption is required in the public interest.
 
 
 73
 49 U.S.C.App. Sec. 1384 (emphasis added).
 
 
 74
 Section 1384 was enacted in 1978 along with amendments to the Federal Aviation Act which substantially deregulated the airline industry. See generally S.Rep. No. 95-631, 95th Cong. 2d Sess. 1 (1978). Prior to amendment in 1978, antitrust immunity was automatically conferred on any person affected by an order of the Civil Aeronautics Board (CAB), which had previously had jurisdiction to approve airline mergers, acquisitions, and other agreements.[8] The Supreme Court had liberally construed this grant of immunity in Hughes Tool Co. v. TWA, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), to extend farther than the CAB itself desired.[9]
 
 
 75
 As a result of this decision, the CAB suggested in hearings on the 1978 legislation amending the Federal Aviation Act that it be given the power to limit the scope of the immunity conferred. See S.Rep. No. 95-631, 95th Cong. 2d Sess. 84-85 (1978). See generally H.Rep. No. 95-1211, 95th Cong. 2d Sess. 18 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 3737, 3754. The Senate bill granted the CAB this power and also limited the immunity conferred to that "necessary to enable such person to engage in the air transportation activities specifically approved by the Board." See S.Rep. No. 95-631, 95th Cong. 2d Sess. 24 (1978) (text of proposed immunity section).
 
 
 76
 While the Senate version continued the automatic immunity concept, these amendments were designed to allow the Board "to approve transactions for transportation purposes, but still refrain from conferring antitrust immunity on any or all aspects of the transaction." Id. at 85 (emphasis added). In discussing the ability of the courts to entertain antitrust challenges to activities which the CAB had previously considered, sponsors of the legislation agreed that
 
 
 77
 the Board could, if it chose, approve of activities that it would not immunize. That is, that in the proper case, the Board might allow a merger or agreement to go forward but still decide to withhold antitrust immunity altogether.... [T]his is important because it will take a lot of responsibility for policing competitive fair play off the Board and put it back on the airline. The Board will not have to always choose between disapproval and antitrust immunity, and the parties will know that they cannot misbehave after initial approval and expect to use a Federal law as a shield against antitrust liability.
 
 
 78
 124 Cong.Rec. 10687 (April 18, 1978) (remarks of Sen. Kennedy).
 
 
 79
 The House version restricted grants of immunity even further by not automatically conferring such immunity on approved transactions. See H.Rep. No. 95-1211, 95th Cong. 2d Sess. 18 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News at 3754. Instead, the House bill conditioned any grant of immunity on the affirmative finding by the Board that such immunity was in the public interest. See id. Opponents of the House version argued the "removal of the automatic exemption from the antitrust laws ... once the Board has given approval to an air carrier agreement as in the public interest is unfortunate and creates ambiguity," Minority Views of Rep. Stump, id. at 72, reprinted in 1978 U.S.Code Cong. & Admin.News at 3767, but the Conference Committee nonetheless adopted the House version. See House Conf.Rep. No. 95-1779, 95th Cong.2d Sess. 78 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 3773, 3792.
 
 
 80
 Northwest contends these amendments to the Act's immunity provisions are irrelevant to consideration of whether section 1486 of the Act establishes the exclusive means for challenging the merger on antitrust grounds. See 49 U.S.C.App. Sec. 1486. Northwest further contends that if the merger had been immunized, all of plaintiff's antitrust claims would be barred. But this argument ignores Congress' express intent to grant the DOT authority to limit the immunity granted to all, some, or none of the transaction it approves. See 49 U.S.C.App. Sec. 1384.[10]
 
 
 81
 In my view, the judicial review provisions of the Federal Aviation Act should not be interpreted to preclude independent judicial action to enforce the antitrust laws where, as here, the agency has specifically declined to grant antitrust immunity to the approved transaction.[11] The doctrine of exclusive jurisdiction is to be invoked only when a court finds that it has been totally ousted of jurisdiction because Congress, in enacting the regulatory statute, "intended to override the fundamental national policies embodied in the antitrust laws." Otter Tail Power Co. v. United States, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973). See generally 16E Business Organizations, Von Kalinowski, Antitrust Laws and Trade Regulation, Sec. 44A.01 (1989).
 
 
 82
 While the statutory scheme concerning DOT's approval of mergers is comprehensive, allowing an independent antitrust challenge to non-immunized airline mergers is consistent with Congress' intent, in the era of deregulation, to "take a lot of responsibility for policing competitive fair play off the [agency]," 124 Cong.Rec. 10687 (remarks of Sen. Kennedy), and to subject the airlines' activities to the same antitrust standards applicable to unregulated industries. See H.Conf.Rep. No. 95-1779, 95th Cong. 2d Sess. 72-73 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 3773, 3788-89. See generally P. Areeda & H. Hovenkamp, Antitrust Law para. 223.2 (Supp.1988).[12]
 
 
 83
 Where immunity is granted, I agree that the court of appeals has exclusive jurisdiction to review the challenged action. But where immunity is neither requested by the carrier nor granted by the agency, district courts should be free to entertain antitrust challenges such as the plaintiff has presented in this case. In sum, I believe plaintiff is entitled to challenge the Northwest-Republic merger under Sections 1 and 2 of the Sherman Act and is entitled to a trial on its claims relating to an alleged agreement between Northwest and Simmons to eliminate plaintiff from the Detroit regional market. While I agree with the majority that plaintiff's state law claims against Northwest were properly dismissed by the district court, I would reverse the district court's grant of summary judgment on plaintiff's antitrust claims and on its state law claims against defendant Simmons alone,[13] and accordingly, I dissent.
 
 
 
 *
 THE HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable Donald D. Alsop, Chief Judge, United States District Court for the District of Minnesota
 
 
 [2]
 Prior to its relationship with Northwest, Fischer had provided regional service for USAir in Detroit
 
 
 [3]
 The acquisition of Republic also gave the new Northwest/Republic combination overlapping regional service contracts for the Twin Cities area, but the regional carriers there, Express I and Mesaba, reached a mutual agreement, without incident, to divide routes and share the market
 
 
 [4]
 Such an agreement would provide Fischer with routes that Simmons, after being granted the right of first refusal, had declined to serve
 
 
 [5]
 The Supreme Court has held that "[i]t is well accepted * * * that without filing a cross-appeal or cross-petition, an appellee may rely upon any matter appearing in the record in support of the judgment below." Schweiker v. Hogan, 457 U.S. 569, 585 n. 24, 102 S.Ct. 2597, 2607 n. 24, 73 L.Ed.2d 227 (1982) (citing Blum v. Bacon, 457 U.S. 132, 137 n. 5, 102 S.Ct. 2355, 2359 n. 5, 72 L.Ed.2d 728 (1982)). Therefore, in this appeal, Northwest and Simmons may properly rely on the issue of antitrust injury (which the district court chose not to decide) in seeking affirmance of the district court's summary judgment order. We affirm the order as it relates to Fischer's antitrust claims on antitrust injury grounds alone. We are able to do so because antitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws. See Midwest Communications v. Minnesota Twins, 779 F.2d 444 (8th Cir.1985), cert. denied, 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986) (where plaintiff fails to show antitrust injury, it lacks standing to sue under the antitrust laws and the court need not reach the merits of its antitrust claims). See generally L.A. Sullivan, Antitrust, 770, 774. In light of Midwest Communications, we affirm the dismissal of Fischer's antitrust claims on grounds of lack of standing, so we need not examine the merits of the claims; specifically, whether Northwest and Simmons conspired to monopolize the Detroit market or to terminate Fischer, or whether the Republic acquisition was barred by the approval of the Department of Transportation
 
 
 [6]
 Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."
 In Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court stated that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses * * *." 477 U.S. at 323-24, 106 S.Ct. at 2553. Therefore, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole * * *." Id. at 327, 106 S.Ct. at 2555.
 Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.
 Id.
 The Court in Celotex then held that summary judgment must be granted where a party fails to make a sufficient factual showing regarding an essential element of its case:
 In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
 477 U.S. at 322-23, 106 S.Ct. at 2552.
 
 
 [7]
 Section 4 states that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * *."
 We note the Second Circuit's recent observation that the United States Supreme Court has indicated that although a showing of antitrust injury is required from plaintiffs in both injunction and damages cases, "standing analysis under Sec. 16 will not always be identical to standing analysis under Sec. 4." See Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 259 n. 6 (2d Cir.1989) (quoting Cargill v. Monfort of Colorado, Inc., 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986)).
 The court in Gold Fields explains that:
 Since section 4 allows for treble-damage recovery, courts will generally be more circumspect about granting relief: "In order to protect against multiple lawsuits and duplicative recoveries, courts should examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff under Sec. 4."
 Id.; see also Associated General Contractors of California, Inc. v. Carpenters, 459 U.S. 519, 544-45, 103 S.Ct. 897, 911-12, 74 L.Ed.2d 723 (1983).
 In other words, the court in Gold Fields observes, "Cargill supports the proposition that standing analysis under section 16 is * * * less rigorous than that under section 4." Consolidated Gold Fields, 871 F.2d at 259 n. 6. We need not apply the extra-rigorous Cargill standing analysis to Fischer's antitrust claims since Fischer has failed to cross the initial threshold of proving that it suffered an antitrust injury. However, we note that even if it had done so, Fischer would still have had further obstacles to pass before it could establish that it was entitled to damages under section 4.
 
 
 [8]
 We note that two of Fischer's common-law claims cite Simmons as a defendant or co-defendant. Therefore, they are arguably not covered by the mandatory arbitration clause in the 1985 Northwest/Fischer agreement. We take no position on that question, as Fischer has briefed and argued the five common-law claims as though they were either all covered by the clause or not covered at all. During oral argument, counsel for Fischer stated that the common-law claims against Simmons "rise and fall depending on whether there is concerted action" found between Northwest and Simmons. In addition, Argument III in Fischer's brief reads, "The Trial Court Erred in Holding That the Arbitration Clause of the Fischer Bros.-Northwest Agreement Barred All Common Law Claims" (emphasis added). Appellant's brief at i. In the district court, Judge Alsop dismissed the common-law claims against Simmons on substantive grounds, concluding that both claims were predicated on an alleged agreement between Northwest and Simmons to terminate Fischer and that Fischer "simply failed to create a factual issue regarding the existence of an agreement to terminate [Fischer]." Fischer v. NWA, slip op. at 21
 
 
 [9]
 It is clear that Fischer chose quite early in the development of its claims to ignore the arbitration clause. On October 14, 1986, well within any measurement of the 120-day time period, Fischer, instead of seeking arbitration, sent a notice of default to Northwest. The notice alleged that Northwest had breached the 1985 agreement and threatened Northwest with legal action
 
 
 [1]
 Airlines operating on a nationwide basis have developed "hubs," populous cities at which substantial numbers of an airline's flights converge and offer connecting opportunities
 
 
 [2]
 Commuter carriers generally serve smaller communities with smaller aircraft. Commuter carriers which affiliate with a major carrier are able to use the major carrier's logo and have access to the major carrier's designator code shown in computerized reservation systems
 
 
 [3]
 The President of Simmons candidly admitted that Northwest's representations "were a factor" in his thinking concerning whether to oppose the merger before the DOT
 
 
 [4]
 The two carriers serving the Minneapolis/St. Paul regional market eventually reached agreement on a division of that market
 
 
 [5]
 To withstand a motion for summary judgment, plaintiff must show "the inference of conspiracy is reasonable in light of the competing inference of independent action." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985). Plaintiff's evidence does precisely that. Cf. In re Workers' Compensation Insurance Antitrust Litigation, 867 F.2d 1552, 1560-61 (8th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989) (finding sufficient evidence to create a genuine issue of fact as to whether defendants entered into an agreement to boycott, coerce, or intimidate insurers to agree to uniform rate for worker's compensation insurance); Apex Oil Co. v. DiMauro, 822 F.2d 246, 252-56 (2d Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987) (finding sufficient evidence of conspiracy based upon parallel behavior and evidence of telephone conversation between two defendants)
 
 
 [6]
 Northwest argued before the DOT that commuter carriers can compete effectively even without affiliation with a major carrier or through affiliation with a major carrier at cities where the major carrier does not operate a hub. Northwest further argued that there are no barriers to the creation of a hub at Detroit by a competing major airline. These, of course, are questions of fact which cannot be resolved on a motion for summary judgment
 
 
 [7]
 Section 1486 provides, in relevant part:
 (a) Any order, affirmative or negative, issued by the Board or Secretary of Transportation under this chapter ... shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order....
 * * *
 (d) Upon transmittal of the petition to the Board or Secretary of Transportation, the court shall have exclusive jurisdiction to affirm, modify, or set aside the order complained of, in whole or in part, and if need be, to order further proceedings by the Board or Secretary of Transportation....
 49 U.S.C.App. Sec. 1486.
 
 
 [8]
 The CAB's antitrust and consumer functions were transferred to the DOT as of January 1, 1985. See Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98-443, 98 Stat. 1703 (1984). The CAB had operated for many years under the automatic immunity provisions of section 1384 which, prior to amendment in 1978, had provided:
 Any person affected by any order under [the Federal Aviation Act] shall be, and is hereby, relieved from the operation of the "antitrust laws" ... and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order.
 
 
 [9]
 The Court overturned an award of more than $145 million to TWA, which the airline alleged had resulted from its control by Hughes Tool Co. (Toolco). In its lawsuit, TWA alleged Toolco had required TWA to purchase or lease airplanes from Toolco alone. The CAB had approved Toolco's control over TWA in orders issued in 1944, 1948, 1950, and 1960, and had approved each acquisition or lease of aircraft by TWA from Toolco. 409 U.S. at 369, 379, 93 S.Ct. at 652, 657. The CAB argued before the Court that it had approved the arrangements only on the basis of a lack of showing of anticompetitive effects in the airline industry, not in the aircraft manufacturing industry, but the Supreme Court ruled the CAB had the authority to consider all aspects of a transaction and found Toolco immune from suit. Id. at 389, 93 S.Ct. at 661
 
 
 [10]
 Scholars agree that the task of resolving "those difficult situations in which antitrust enforcement appears to be coextensive with administrative regulation" is not an easy one. See 16E Business Organizations, Von Kalinowski, Antitrust Laws and Trade Regulations Sec. 44A.01 at 44A-2 (1989). Whether phrased in terms of immunity or exclusive jurisdiction, the issue in this case is whether Congress intended to leave judgments about whether mergers violate the antitrust laws entirely to the agency (with review in the court of appeals), even when the agency declines to exempt the merger from the operation of the antitrust laws. See Id. at Secs. 44.01, 44A.05 (discussing exclusive jurisdiction under the rubric of exemptions and immunities to the antitrust laws). See also K. Davis, Administrative Law Treatise Sec. 22.9 at 116 (2d ed. 1983); P. Areeda & D. Turner, Antitrust Law, para. 223h (1978)
 
 
 [11]
 "Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored," and have only been found "in cases of plain repugnancy between the antitrust and regulatory provisions." United States v. Philadelphia National Bank, 374 U.S. 321, 350-51, 83 S.Ct. 1715, 1734-35, 10 L.Ed.2d 915 (1963)
 
 
 [12]
 It is also more consistent with actual enforcement of the antitrust laws, given Congress' view of the agency's record in this regard. As the Senate Report noted, the CAB tended to "identify its own success with the profitability of individual carriers" and had also tended to regard mergers as "a tool for insuring the financial well-being" of economically ailing air carriers. S.Rep. No. 95-631, 95th Cong.2d Sess. 4, 79 (1978)
 
 
 [13]
 The district court dismissed plaintiff's state law claims against Simmons for lack of sufficient evidence of an agreement between Simmons and Northwest. Because I find sufficient evidence of such an agreement to withstand a motion for summary judgment, I would reverse this dismissal, notwithstanding Simmons' argument on appeal that plaintiff has abandoned its state law claims against Simmons. Plaintiff clearly has argued the sufficiency of the evidence to sustain its claim of an agreement between Simmons and Northwest, and its state law claims "rise or fall" on the basis of this issue. See n. 8 supra at 600