**O.K. SAND AND GRAVEL, INC., an Indiana corporation, Plaintiff,**

v.

**MARTIN MARIETTA CORPORATION, a Maryland corporation, Defendant.**

**No. IP 90 1051–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 18, 1992.

Order on Reconsideration Dec. 31, 1992.

R. James George Jr., John M. Harmon, G. Michael Lawrence, Graves, Dougherty, Hearon & Moody, Austin, TX, G. Thomas Blankenship, Blankenship & Robbins, Indianapolis, IN, for plaintiff.

Donald E. Knebel, Lynn C. Tyler, Barnes & Thornburg, Indianapolis, IN, for defendant.

1. O.K. Sand's First Amended Complaint has been superseded, and the Court interprets O.K.

### ENTRY

BARKER, District Judge.

This matter is before the Court to address O.K. Sand's "Motion for Summary Judgment on Martin Marietta's Antitrust Counterclaims" and Martin Marietta's "Motion for Summary Judgment on O.K. Sand's First Amended Complaint."[1] Upon review of those motions, the Court GRANTS O.K. Sand's motion for summary judgment and DENIES in part and GRANTS in part Martin Marietta's motion for summary judgment.

### I. Findings of Fact:

As we have noted in prior rulings, O.K. Sand and Gravel deals in sand and gravel. O.K. Sand is jointly owned by George Kopetsky, Sr., who holds a 78% interest, Patricia Kopetsky, who holds a 10% interest, and George Kopetsky, Jr., who holds a 12% interest. O.K. Sand operates out of a single location on Belmont Avenue (on the south side of Indianapolis), and prior to 1984, its reserves of sand and gravel totaled approximately 25 million tons.

The Martin Marietta Corporation also deals in sand and gravel, as well as crushed stone and other aggregate-type material. In 1984, Martin Marietta produced and sold sand and gravel from two locations, one on 86th Street (on the north side of Indianapolis) and the other on Kentucky Avenue (on the south side of Indianapolis, within four miles of O.K. Sand's Belmont Avenue facility.) In 1984, in contrast to O.K. Sand's, Martin Marietta's supply of sand and gravel was running out; it had only two-to-three years' supply of sand and gravel remaining at its 86th Street facility and only three-to-four years' supply of sand and gravel remaining at its Kentucky Avenue facility.

In April of 1984, O.K. Sand needed someone who could provide it with financial and marketing assistance, and Martin Marietta wanted (if not needed) someone who could provide access to additional sand and gravel reserves. Thus, the two companies decided to enter into a relationship whereby Martin Marietta became O.K. Sand's "exclusive sales

Sand's motion for summary judgment as attacking the operative, Second Amended Complaint.

agent." The parties signed a preliminary agency agreement and their "Letter of Intent," and thereafter Martin Marietta and O.K. Sand announced the creation of their business arrangement on April 19, 1984 by distributing to their customers a *"Price List"* for the products to be sold under the O.K. Sand/Martin Marietta arrangement.

In November of 1984, O.K. Sand and Martin Marietta further formalized their agency arrangement by executing the "Sales Agency Agreement." The Sales Agency Agreement provided (in part):

> NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:
>
> 1. *Appointment as Exclusive Agent.* O.K. appoints Martin as its exclusive sales agent to sell all aggregates, materials, products or goods excavated, produced or held by O.K. at the Facility.
> 2. *Duties of Martin.* Martin shall solicit all orders for the Products [at the set "List Prices"] and prepare all arrangements for the delivery of the Products including truck procurement, scheduling and expediting.
> 3. *Duties of O.K.* O.K. shall keep a minimum inventory of Products at the Facility throughout the term of this Agreement, or any extensions thereof, ... and, furthermore, shall excavate and produce Products at such frequency and in such volume to supply the reasonable requirements of its customers.
>
> \* \* \* \* \* \*
>
> 5. *Specifications and Price.* Martin shall solicit orders for products ranging in size, meeting such specifications, and consisting of such quantities as are set forth in Exhibit A attached hereto....

> Martin shall collect orders for the Products at the prices set forth in Exhibit B attached hereto (the "List Prices"). The List Prices shall be subject to modification by the parties with their mutual consent....

The Sales Agency Agreement automatically renewed year to year, unless one of the parties tendered a timely (90 day advance) written notice of cancellation.

In addition to the above quoted provisions, the Letter of Intent and Sales Agency Agreement provided that: (1) Martin Marietta would market and sell O.K. Sand's products in exchange for a 15% commission on O.K. Sand sales; (2) Martin Marietta could, without O.K. Sand's prior authorization, sell O.K. Sand's products at discounts of up to 10% off the "List Price" for processed products and up to 20% off the "List Price" for fill products; and (3) O.K. Sand would invoice Martin Marietta monthly for 85% of the total O.K. Sand sales (the remaining 15% constituting Martin Marietta's commission.)

Although the Sales Agency Agreement stated that Martin Marietta was to charge the prices listed at "Exhibit B attached hereto," no such price list was ever attached to or formally incorporated under the Sales Agency Agreement. (The parties agree, however, that the April 19, 1984 *"Price List"* was the operative price list under the agency agreements for 1984.) Martin Marietta and O.K. Sand jointly issued a new price list for 1985, and thereafter price lists were independently issued by Martin Marietta on an annual basis. One of the key, material disputes in this case is whether Martin Marietta had the unilateral, independent authority to set the prices for those O.K. Sand's products which it sold.[2]

---

**2.** Martin Marietta claims that in 1986, Mr. Kopetsky gave Martin Marietta the independent authority to establish the "List Prices" and make sales at prices exceeding 10% or 20% below "List Prices" without O.K. Sand's prior consent. In support of this claim, Martin Marietta cites the deposition testimony of its sales manager, John Schuler:

> Q. What provisions did you think were changed by your discussions with Mr. Kopetsky?

> A. That we no longer sat down and went over and had a mutual understanding on list price each year.
> Q. All right. So you understood after '85 that Martin Marietta could establish a list price without Mr. Kopetsky's prior consent?
> A. On Mr. Kopetsky's okay, I did that, yes, sir.

Schuler Deposition, p. 119–120.

O.K. Sand, however, claims that it never gave Martin Marietta such authority, and in support thereof, cites Kopetsky's deposition testimony:

When Martin Marietta started selling O.K. Sand's products in 1984, Martin Marietta did not provide specific pricing information to O.K. Sand, with one exception.[3] Because Martin Marietta did not give O.K. Sand specific pricing information, O.K. Sand could not invoice Martin Marietta for the 85% amount of its sales. Instead, at the end of every month, Martin Marietta sent O.K. Sand an "Invoice Register" and a corresponding remittance check which Martin Marietta had calculated as the appropriate amount.

These Invoice Registers were at best cryptic documents. They did not specify the tonnage of each particular product on a per-sale basis or breakdown the amounts the customer paid for each product. Rather, the Invoice Registers, referring to each customer by a six-digit "Cust No.," reported only the gross tonnage each customer had purchased and the total amount Martin Marietta had received from the customer. Nevertheless, Martin Marietta maintains that the Invoice Registers were sufficient to allow O.K. Sand to calculate the *average* price per ton of each sale, even though it was impossible to determine the product breakdown on any particular sale.[4]

In an effort to establish that O.K. Sand had notice or could have had notice of Martin Marietta's pricing and sales practices, Martin Marietta cites a series of convoluted, complex calculations which it claims O.K. Sand could have conducted on the basis of documentation it had provided O.K. Sand. Martin Marietta argues, for instance, that had O.K. Sand calculated the average price per ton per sale from the Invoice Registers, O.K. Sand would have discovered that Martin Marietta was occasionally selling O.K. Sand's cheapest product for more than 10% or 20% below the established list prices. Martin Marietta claims that had O.K. Sand calculated the average price per ton for all the invoices listed on the August 20, 1984 Invoice Register, and then added up the lowest average prices per invoice (those where the average price was one dollar per ton), O.K. Sand would have discovered that 3,040.95[5] tons of product were sold for an average of one dollar per ton. Martin Marietta further claims that although Fill Dirt, the cheapest O.K. Sand product, sold for one dollar per ton in August of 1984, if O.K. Sand had cross-referenced this figure against the total amount of Fill Dirt sold in August of 1984 (806.3 tons), O.K. Sand would have discovered that Martin Marietta must have sold some product other than Fill Dirt at a price approaching one dollar per ton, which would have been more than 20% below the list price for even the next cheapest O.K. Sand product.[6]

---

A. The only instructions that I ever gave John Schuler was that he had the sales and that he had the right to sell it at the prices was [sic] on our contract, and that's the only thing that John and I discussed.

Kopetsky's Deposition, p. 76.

3. Martin Marietta provided at least one O.K. Sand employee with specific price information regarding sales to one customer, Potter Material.

4. For example, if a customer bought one ton of type A product at one dollar per ton and a second ton of type B product at 5 dollars per ton, the Invoice Register would report only that two tons of product were sold for a total of six dollars. Martin Marietta claims that from this data, O.K. Sand could calculate that the customer had paid an average of three dollars per ton.

5. O.K. Sand claims this figure to be 3,105.05. *See* O.K. Sand's Brief in Opposition to Martin Marietta's Motion for Summary Judgment, Appendix I, p. 18.

6. Martin Marietta explains that if it sold the 806.3 tons of Fill Dirt at 20% off the list price (80 cents per ton), to reach an average of one dollar per ton for 3,040.95 tons, it must have also sold something like 2,234.65 tons of Fill Sand, the next cheapest O.K. Sand product, for $1.07 per ton, which is 13 cents per ton below 20% off the list price for Fill Sand.

The Court notes that there are several problems with this analysis, however, beyond the difficulties inherent in making these calculations. The document Martin Marietta refers to in determining how much product was sold per month was not even created until some eight months after Martin Marietta printed and distributed the August 1984 Invoice Register; it was created by Alice L. Huffman, who was not even hired as O.K. Sand's bookkeeper until April of 1985. In addition, the August 1984 Invoice Register reports that Customer No. 322727 made several "negative" purchases, whatever that means, of a one-dollar product in August of 1984. For example, the Invoice Register reports:

Martin Marietta also claims that had O.K. Sand cross-referenced each "Cust. No." with an available customer list (which was separately supplied by Martin Marietta),[7] O.K. Sand could have discovered that Martin Marietta was selling other O.K. Sand products for more than 10% or 20% below the "List Prices."[8]

Quite aside from the issue of whether O.K. Sand was required to go to such lengths to determine the pricing practices of Martin Marietta, there is no indication that O.K. Sand performed these bookkeeping gymnastics suggested by Martin Marietta. However, starting in June of 1985, O.K. Sand's newly hired bookkeeper, Alice Huffman, did attempt to reconcile Martin Marietta's monthly checks with the Invoice Registers. Not surprisingly, she could not. According to her deposition, Huffman's efforts to reconcile the pre-April 1985 remittance checks, taking into account a "15% discount of some kind," also failed. Huffman Deposition, p. 60.

One reason Huffman was unable to reconcile the Invoice–Registers with the corresponding remittance checks, according to O.K. Sand, was that Huffman was unaware of the discounts allowed under in the Sales Agency Agreement.[9]

Unable to reconcile the Invoice Registers with the remittance checks, Huffman (throughout 1985) called Martin Marietta and requested additional pricing information. But O.K. Sand asserts that each time Huffman called Martin Marietta, John Schuler, Martin Marietta's sales manager, responded by speaking rudely to Huffman and telling her that she was not entitled to that information because she was not management and that pricing information was none of her

| Inv. No. | Cust. No. | Tons | Matl Amount |
|----------|-----------|---------|-------------|
| 4138724 | 322727 | 479.70– | 719.51– |
| 4138725 | 322727 | 141.95– | 212.97– |
| 4138726 | 322727 | 719.65– | 1079.89– |
| 4138727 | 322727 | 1043.05– | 1564.48– |

O.K. Sand's Brief in Opposition to Martin Marietta's Motion for Summary Judgment, Appendix I, p. 19.

O.K. Sand points out that these entries "cancel out matching positive transactions in tons. And the dollar amounts for Customer No. 322727 with respect to these transactions actually comes out to be negative number because the negative dollar entries exceed the positive dollar entries." *Id.* Further, without Customer No. 322737's one dollar purchases, the total amount of product that sold for an average of one dollar per ton amounted to only 340.30 tons, well within the 806.3 tons of Fill Dirt actually sold in August of 1984.

7. Alice L. Huffman, O.K. Sand's bookeeper since April of 1985, testified in her deposition that Martin Marietta supplied O.K. Sand with a separate list of customer names and corresponding customer numbers.

8. Martin Marietta claims that had O.K. Sand cross-referenced Customer No. 398222 with a customer list, it would have discovered that Customer No. 398222 was in fact Independent Concrete Pipe. Martin Marietta further claims that it sold Customer No. 398222 (Independent Concrete Pipe) "no. 24 sand (also called concrete sand or 14–2 sand) and various sizes of gravel at least in part from [the] O.K. [Belmont facility.] (Affidavit of Steve DuBois, Exs. 1–4)." Memorandum in Support of Martin Marietta's Motion

for Summary Judgment on O.K.'s First Amended Complaint, p. 11.

Martin Marietta claims that had O.K. Sand examined invoices 5045029, 505355, 5058419, and 5062530, all Customer No. 398222 a/k/a Independent Concrete Pipe purchases, it would have known that Independent Concrete Pipe paid on average $2.18, $1.87, $1.91, and $1.90, per ton per invoice in August 1985.

Martin Marietta claims that had O.K. Sand made these calculations and compared them to the list prices for 1985, it would have discovered that these average prices were more than 10% or 20% below the "List Prices" for no. 24 sand or any size gravel in 1985; Martin Marietta claims that the lowest price for no. 24 sand or any size gravel in 1985 was $3.50. Martin Marietta does not explain, however, how O.K. Sand would have known that Independent Concrete Pipe was *only* buying no. 24 sand and gravel; despite Martin Marietta's citation to Exhibits 1 through 4 of Steve DuBois' affidavit, those exhibits and DuBois's affidavit are unenlightening in this regard.

9. Huffman testified she did not know that under the Sales Agency Agreement Martin Marietta was allowed to sell O.K. Sands products 10% or 20% below list prices:

I never tried to figure 10 percent or any percent. I only went with my list price and what was paid here and I never even tried to figure percent. I did not know anything about a percent.

Huffman Deposition, p. 202.

business.[10] Huffman Deposition, p. 284–286. According to Huffman:

A. ... [T]his is what [Schuler] said: "I am the one that sets the prices and I am the one that makes these decisions and this is no concern of yours." And if I would press, then he would say: Well, blankety blank, blank, Alice.

 \* \* \* \* \* \*

A. Sometimes I would hang up the telephone and sit and cry.

Q. Tell the jury how often Mr. Schuler made you cry.

A. Just about every time we talked.

Huffman Deposition, p. 286–87.

By the end of 1985 and in the face of this obtrusive resistance, Huffman stopped asking Martin Marietta for pricing information.

Martin Marietta claims that at about the same time, in or about January of 1986, Martin Marietta had installed a computer in O.K. Sand's office to print scale tickets and keep track of sand and gravel sales. However, the computer was not set up to readily display pricing information, although that information may have been available through the computer by accessing pricing information "by product." Huffman Deposition, p. 75.

In addition to asking Martin Marietta for more pricing information, starting in June of 1985, Huffman discussed the check/Invoice Register discrepancies with Kopetsky, Sr. "every couple of months." Kopetsky Deposition, p. 323–24. Based on these discussions with Huffman, Kopetsky testified that by November of 1986, he "didn't think [O.K. Sand] was getting as much money out of stuff as we should have been getting," and asked Martin Marietta for more information regarding the pricing and sales of O.K.

Sand's products. Kopetsky Deposition, p. 267–68. A few months later, either in February (according to Martin Marietta) or June (according to O.K. Sand) of 1987, Martin Marietta began sending O.K. Sand a monthly document entitled "Average Selling Price Analysis By Product" (hereinafter referred to as the "ASPAP" documents.) See Memorandum in Support of Martin Marietta's Motion for Summary Judgment, Appendix II, tab 2.

The ASPAP documents reported the average price Martin Marietta had charged purchasers of O.K. Sand's products for the previous month, "along with the total tons sold, among other things." [11] Memorandum in Support of Martin Marietta's Motion for Summary Judgment on O.K.'s First Amended Complaint, p. 12. According to Martin Marietta, a quick calculation would have revealed to O.K. Sand that Martin Marietta was selling O.K. Sand's products for amounts in excess of the 10% or 20% below list-price levels. Martin Marietta claims that O.K. Sand did make such calculations and discovered for itself that Martin Marietta was on occasion selling O.K. Sand's products for more than 10% or 20% below the list prices. Kopetsky's Deposition, p. 312–14.

Martin Marietta further claims after it started sending to O.K. Sand the ASPAP documents, O.K. Sand did not request additional pricing information, did not inform Martin Marietta that it thought Martin Marietta was selling products in breach of the Sales Agency Agreement, and did not exercise its right to cancel the agency agreement the following year.

O.K. Sand, however, denies that it knew Martin Marietta was selling O.K. Sand products at more than 10% or 20% below the list

---

10. The parties agree that it is common in the sand and gravel industry not to allow nonessential personnel or "employees in the scale house" access to actual prices, in fear that "truckers and other competitors" might gain access to it. The parties do not agree, however, about whether Alice Huffman was an "employee in the scale house" or the type of employee who is normally denied access to pricing information, nor do the parties agree that Martin Marietta's conduct toward Huffman was reasonable and in accord with the industry practice.

11. The ASPAP documents reported how many tons of each particular product were sold and the average price Martin Marietta received for each product for a particular month (and for the year to date.) The ASPAP documents also reported the total amount of product "Transferred to Martin Marietta" and the total amount Martin Marietta paid for the "transferred" products.

prices and claims that it did complain to Martin Marietta about the inadequacy of the ASPAP documents, citing Kopetsky Deposition at p. 314–318.[12]

In January 1989, O.K. Sand notified Martin Marietta that it wanted to cancel the agency agreement. One month later, O.K. Sand's attorney sent a letter to Martin Marietta, which, according to Martin Marietta, confirms that O.K. Sand knew that Martin Marietta had been selling O.K. Sand's products "below the list price." The letter stated (in relevant part):

> My client's records indicate that on enumerable instances, products were sold at below the list price less authorized discounts, and that as a result, during the four years of this contract significant amounts of unauthorized discounts have been given by your company. My client views this as a very serious matter, and would respectfully suggest that an accounting be made representing the time period of the agreement.
>
> We have been provided, on an irregular basis, with a document identified as CBM380, Average Selling Price Analysis By Product. It would appear that an accumulation of these documents would be very enlightening. . . .

Memorandum in Support of Martin Marietta's Motion for Summary Judgment on O.K.'s First Amended Complaint, Appendix II, Tab 1.

Three months later, O.K. Sand executed a new agency agreement with another sand and gravel company, American Aggregates, and one year later, on April 24, 1990, O.K. Sand filed its complaint initiating this action against Martin Marietta, alleging breach of contract, fraud, conversion, and breach of fiduciary duty. O.K. Sand's claims against Martin Marietta, as detailed in its Second Amended Complaint, can be summarized as five (somewhat overlapping) wrongs:

1. Sales below minimum prices: O.K. Sand claims that Martin Marietta sold O.K.'s products below the authorized prices (more than 10% or 20% below the "List Prices").

2. Transfers: O.K. Sand claims that Martin Marietta purchased and "transferred" O.K. Sand's products from O.K. Sand's facility to its Kentucky Avenue facility and then resold the products as its own; that Martin Marietta engaged in self-dealing and that Martin Marietta "transferred" O.K. Sand's products at unauthorized prices.

3. Packaging: O.K. Sand claims that Martin Marietta offered and sold to its customers a "package" deal, whereby Martin Marietta offered O.K. Sand's products at a low price only if the customer bought Martin Marietta's product at high price.

4. Transfers to the north side: O.K. Sand claims that Martin Marietta created new names for two of O.K. Sand's products, "transferred" them to Martin Marietta's 86th Street facility, and sold the products at unauthorized prices and not "F.O.B. Plant," [13] as the Sales Agency Agreement dictates, with delivery or transfer costs incorporated in the (hence lower) price.

5. Breach of fiduciary duties: Martin Marietta breached various fiduciary duties by failing to use its best efforts (as an agent/fiduciary) to sell O.K. Sand's products and failing to make full disclosures to O.K. Sand regarding the pricing and marketing of O.K. Sand's products.

In response, Martin Marietta filed its counterclaim, alleging, in part, that by en-

---

**12.** O.K. Sand also claims that "through its counsel Tom Blankenship, [O.K. Sand] requested an accounting of additional information in communications with Martin Marietta in late 1988 and early 1989." *See* O.K. Sand's Brief in Opposition to Martin Marietta's Motion for Summary Judgment, Appendix I at p. 27. Although the Court recognizes that Blankenship is the author of O.K. Sand's brief (the appendix's author is not indicated), the appendix is not a sworn document and is, by itself, insufficient to establish a genuine issue of fact on this issue. Fed.R.Civ.P. 56(e).

**13.** F.O.B. stands for Free on Board; delivered by the seller aboard a truck, train, or ship at the point of shipment, without further charge to the buyer. Webster's New World Dictionary of the American Language, p. 578 (College Ed.1964).

gaging American Aggregates as its exclusive sales agent, O.K. Sand violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C. §§ 1, 2, and 14.

Martin Marietta has based its motion for summary judgment on two grounds. First, Martin Marietta claims that because O.K. Sand had actual and constructive knowledge of Martin Marietta's alleged breaches, but nonetheless allowed the agency agreement to renew four times, expressing only satisfaction with Martin Marietta's performance under the agency agreement, Martin Marietta is entitled to judgment in its favor on O.K. Sand's claims based on the defenses of waiver, estoppel and modification. Second, Martin Marietta claims that, even if the undisputed facts do not establish these defenses, it is clear that O.K. Sand had actual and constructive knowledge of the alleged bad acts as early as 1984, and O.K. Sand's claims are therefore barred by the appropriate statute of limitations.

O.K. Sand has moved for summary judgment as well, claiming that with respect to Martin Marietta's Sherman and Clayton Act counterclaims, Martin Marietta cannot prove that it has suffered or will suffer any antitrust injury. O.K. Sand also seeks summary judgment on the basis that Martin Marietta lacks standing to bring an action under Sections 1 and 2 of the Sherman Act, characterizing Martin Marietta as "a former producer which has depleted its own natural resource and is neither a producer or customer in the Market." [14]

## II. Conclusions of Law

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions, and affidavits do not raise a genuine issue of material fact. Federal Rule of Civil Procedure 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). However, "any doubt as to a fact, or an inference to be drawn, is resolved in favor of the nonmoving party." *Shuamber v. Henderson,* 579 N.E.2d 452, 454 (Ind. 1991).

### I.

### Modification of Previous Ruling

■ In discussing which statute of limitations is applicable to O.K. Sand's complaint, the Court previously ruled that a two-year statute of limitations applies to Counts I–IV. *See O.K. Sand and Gravel, Inc. v. Martin Marietta Corp.,* 786 F.Supp. 1442, 1448 (S.D.Ind.1992). In so holding, the Court stated that Counts I–IV do not state breach of contract claims, but rather breach of fiduciary duty claims in a contractual context. The Court now modifies and refines that ruling as follows: the two-year statute of limitations bars the claims in Count III and portions of Count IV (which state only breach of fiduciary duties claims), but those parts of Counts I, II, and IV which claim that Martin Marietta breached specific contractual provisions of the Sales Agency Agreement and Letter of Intent are subject to Indiana's ten year statute of limitations for written contracts, and thus they survive the motion to dismiss.

The Court makes this modification in light of the recent Indiana Supreme Court decision in *Lawyers Title Ins. Corp v. Pokraka,* 595 N.E.2d 244 (Ind.1992), and the recent Indiana Court of Appeals decision in *Insul–Mark Midwest, Inc. v. Modern Materials, Inc.,* 594 N.E.2d 459 (Ind.Ct.App.1992) (decided June 16, 1992). In *Pokraka,* the Supreme Court limited and clarified the import

---

14. O.K. Sand also moves for summary judgment on the grounds that Martin Marietta's Clayton Act claim is jurisdictionally deficient in two respects. First, O.K. Sand claims that Martin Marietta's counterclaim fails to cross the "Clayton Act's jurisdictional threshold," in that Martin Marietta fails to show there was an exclusive agreement. Second, O.K. Sand claims that Martin Marietta has failed to allege facts within the jurisdictional ambit of the Clayton Act's "in any line of commerce" requirement. In light of the Court's ruling on the standing/injury issue, the Court does not address these additional claims.

of *Whitehouse v. Quinn*, 477 N.E.2d 270 (Ind.1985), the primary case on which this Court relied in deciding the statute of limitations issue in its previous entry, by holding that an ignoring of specific statutorily established periods of limitation is tantamount to a judicial repeal. *Pokraka*, at *1. In *Insul–Mark Midwest*, the Court of Appeals, citing *Whitehouse*, found that when a manufacturer fails to conform to the terms of a service contract, Indiana's statute of limitations for contracts applies. *Insul–Mark Midwest*, 594 N.E.2d at 464–65.

The substance and nature of the injuries claimed in parts of Counts I, II and IV concern breaches of specific contract terms and failed expectations. Those alleged harms are separate from the harms alleged to have resulted from the breach of a fiduciary duty.

Therefore, the Court now holds that those parts of Counts I, II and IV which allege that Martin Marietta quoted and sold O.K. Sand's products at prices more than 10% or 20% below the "List Prices" are subject to Indiana's ten year statute of limitations for contract actions, *Pokraka*, *supra*, and the prior order of dismissal is vacated and these claims are reinstated. For the reasons previously stated in the Court's earlier entry, the remainder of Counts I–IV are subject to a two-year statute of limitations and the prior order of dismissal in this regard is affirmed on this reconsideration. *See Whitehouse v. Quinn*, 477 N.E.2d 270 (Ind.1985).

## II.

### Martin Marietta's Motion for Summary Judgment

 Martin Marietta moves for summary judgment on the grounds that Counts I–VII of O.K. Sand's Second Amended Complaint are barred by waiver, estoppel, and modification. Waiver is the intentional relinquishment of a known right. *Ogle v. Wright*, 172 Ind.App. 309, 360 N.E.2d 240 (1977); *Lafayette Beverage Distributors, Inc. v. An-*

heuser–Busch, Inc., 545 F.Supp. 1137, 1149 (N.D.Ind.1982). Mere silence, acquiescence, or inactivity does not constitute waiver unless the waiving party has a duty to speak or act. *Lafayette Beverage Distributors, Inc. v. Anheuser–Busch, Inc.*, 545 F.Supp. at 1149. Whether a party has waived a contract provision is ordinarily a question of fact. *Jackson v. Defabis*, 553 N.E.2d 1212, 1217 (Ind.Ct. App.1990).

 Estoppel, in contrast to waiver, focuses not on intent, but on the effect of one's conduct. *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980).

The doctrines of waiver and estoppel are similar, but differ in that a person who is in a position to assert a right ... may by his own words or conduct, and without reference to any act or conduct of the other party affected thereby, waive such right.... Whereas [a]n estoppel does not rise from the words or conduct of one party alone as a waiver does. To create an estoppel, the words or conduct of the party estopped must be calculated to mislead the other party, and such other party must be misled thereby and induced to act in such a way as to place him at a disadvantage.

*Jackson v. DeFabis*, 553 N.E.2d at 1218 (citing *Lafayette Car Wash, Inc. v. Boes*, 258 Ind. 498, 282 N.E.2d 837, 839 (1972)) (quotations omitted). Estoppel therefore arises when one's conduct (not his manifested intent) misleads another into believing that a right will not be enforced and causes the other party to act to his detriment. *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d at 213; *see Lafayette v. Keen*, 113 Ind.App. 552, 48 N.E.2d 63, 70 (1943). Indiana follows the general rule that "silence and acquiescence,[15] when good faith requires a person to speak or act, will satisfy the first element of equitable estoppel." *Warner v. Riddell Nat. Bank*, 482 N.E.2d 772, 775 (Ind.Ct.App.1985). "For silence to give rise to equitable estoppel, there must not only be an opportunity to

---

**15.** Acquiescence is "a release or an abandonment of one's rights if, having rights, he stands by and sees another dealing with his property, in a manner inconsistent with such rights, and

makes no objection while the act is in progress." *Board of Comm'rs v. Plotner*, 149 Ind. 116, 48 N.E. 635 (1897).

speak, but an imperative duty to do so." *Erie–Haven, Inc. v. First Church of Christ,* 155 Ind.App. 283, 292 N.E.2d 837, 842 (1973).

Martin Marietta claims that O.K. Sand knew that Martin Marietta was committing the above listed wrongs, yet by doing nothing to stop these breaches or cancel the agency agreement, it has waived these claims, it has modified [16] the Sales Agency Agreement, and is equitably estopped from bringing this action. The resolution of Martin Marietta's motion, therefore, turns primarily on the time at which O.K. Sand discovered the alleged breaches and the actions O.K. Sand did or did not take after discovering those alleged breaches.

### A. Sales Below "List Prices"

Martin Marietta claims that by virtue of the Invoice Registers, the Potter Material invoices,[17] and eventually, the ASPAP documents, O.K. Sand had actual or constructive knowledge that Martin Marietta was selling below the list prices.

Martin Marietta, however, has failed to demonstrate that the Invoice Registers issued to O.K. Sand were sufficiently detailed and specific to inform O.K. Sand of the prices Martin Marietta was charging for O.K. Sand's products. Without such detail, O.K. Sand could not determine if Martin Marietta was selling O.K. Sand's products at prices below the established minimums. Even if O.K. Sand had proved capable of performing Martin Marietta's suggested bookkeeping techniques which might have led to the determination of whether Martin Marietta was breaching its contractual duties under the Sales Agency Agreement, it is not clear that O.K. Sand would in fact have discovered that Martin Marietta was selling O.K. Sand's product below list prices.

Although Kopetsky testified that by November of 1986, he "didn't think we was [sic] getting as much money out of stuff as we should have been getting," that testimony does not constitute a clear admission that Kopetsky or O.K. Sand knew that Martin Marietta was selling O.K. Sand's products at more than 10% or 20% below the list prices. Kopetsky's statement could be interpreted to mean that he did not think he was getting enough profit, that the list prices were simply too low (recall that by 1986, Martin Marietta claims it was independently setting the prices for O.K. Sand's products), or that Martin Marietta too often sold O.K. Sand's products at the allowable 10% or 20% discount. More importantly, when Martin Marietta's attorney asked whether Kopetsky was "concerned about the average price per ton being too low," Kopetsky did not respond by saying "Yes!"; he stated, "Well, I suppose that would have—if you wasn't getting paid for so many tons that would change the price per ton," and complained that he "didn't know how to find out any answers what I was concerned about because they would never tell me nothing when I would ask them." Kopetsky Deposition, p. 267–68. Finally, when asked if he was "concerned that the information you were getting every month wasn't enough for you to know what was going on," Kopetsky responded, "Well, again, we couldn't ever seem to get any information." *Id.*

Kopetsky's statement that he thought he wasn't getting enough money does not conclusively establish that O.K. Sand had actual knowledge that Martin Marietta was selling O.K. Sand's product at unauthorized prices. Rather, the statements that follow that facially damning quotation suggest that Kopetsky was suspicious but frustrated, that although he thought something was wrong, he

---

**16.** Parties to a contract may mutually modify their contractual undertakings. *Indianapolis v. Twin Lakes Enterprises, Inc.,* 568 N.E.2d 1073, 1084 (Ind.Ct.App.1991). It is not always necessary to prove a written or oral modification of contract because a modification can be implied from the conduct of the parties. *Id.* A modification is the formation of new contract, and requires all of the requisite elements of a contract. *Thatcher Engineering Corp. v. Bihlman,* 473 N.E.2d 1022, 1028 (Ind.Ct.App.1985).

Without engaging in an unncessarily extended discussion, it is sufficient to state that whether the parties mutually modified the Sales Agency Agreement is clearly a disputed question of fact, *see* note two, and summary judgment on this basis is not warranted. *See Goethals v. De Vos,* 174 Ind.App. 143, 366 N.E.2d 673, 676 (1977).

**17.** *See* note three.

was unable to find out for sure. This conclusion is reinforced by the fact that, in November of 1986, Kopetsky again asked Martin Marietta for more specific pricing information.

With regard to the Potter Material invoices, it is not clear that those documents were any more capable of fully informing O.K. Sand that Martin Marietta was selling O.K. Sand product below the authorized list prices. Further, O.K. Sand has presented evidence that those documents were not meant to be, and in fact were not communicated or distributed to O.K. Sand management. Thus, the Potter Material invoices are simply insufficient by themselves to impute to O.K. Sand the knowledge that Martin Marietta was allegedly breaching their contractual and/or fiduciary duties under the Sales Agency Agreement, so as to provide a basis for waiver or estoppel.

The more significant information exchange between O.K. Sand and Martin Marietta was when Martin Marietta began supplying O.K. Sand with the ASPAP documents, which, according to Kopetsky and O.K. Sand, occurred in June of 1987. From these documents, Martin Marietta claims that O.K. Sand should have, and in fact did, realize that Martin Marietta was selling O.K. Sand product at more than 10% or 20% below the list prices.

Indeed, although Kopetsky states that Martin Marietta "had me so confused I didn't know what I was thinking half the time," Kopetsky admits that in the "[e]nd of 1987 or beginning '88 I think we come to the conclusion" that Martin Marietta was breaching the agency agreement. Kopetsky Deposition, p. 310; 384–86. It is therefore clear that there is no genuine issue of fact concerning whether O.K. Sand had actual knowledge of the alleged breaches (regarding sales below authorized prices) as of the "[e]nd of 1987 or beginning '88."

■ Nevertheless, Martin Marietta is still not entitled to summary judgment on the basis of waiver, estoppel, or modification with regard to O.K. Sand's claim that Martin Marietta sold its product at unauthorized prices. By allowing only a single renewal of the Sales Agency Agreement after O.K. Sand

was aware of Martin Marietta's alleged breaches, during which time it demanded more pricing information either to confirm or allay its suspicions, O.K. Sand did not engage in the kind of ongoing, silent acquiescence contemplated in *Saverslak*. *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d at 214. In *Saverslak*, the court held that a seven-year period of silent acquiescence, "without a hint of protest," in the face of ample opportunity to protest is evidence of an intent to relinquish a known right. *Id.; see Central States, Southeast and Southwest Areas Pension ,Fund v. Ekco Products, Inc.*, 581 F.Supp. 374, 378 (N.D.Ill.1984) (ten year silent acquiescence "at some point ripened into an intentional relinquishment of its right[s]"). We have decidedly different facts in the case at bar.

It is undisputed that throughout the term of the agency, O.K. Sand pressed Martin Marietta for better and more detailed pricing information. Martin Marietta has not established, as a matter of law, that O.K. Sand displayed a clear intent to waive a known right over a period of years, nor has Martin Marietta demonstrated that O.K. Sand's failure to cancel the Sales Agency Agreement was "calculated to mislead" Martin Marietta. As a matter of law, Martin Marietta cannot rely on its refusal to provide additional information, information that may have made the alleged breaches more apparent, to establish estoppel or waiver, *Rushville Nat. Bank v. State Life Ins. Co.*, 210 Ind. 492, 1 N.E.2d 445, 449 (1936), and Martin Marietta thus is ineligible for equitable relief on the basis of waiver or estoppel. *See Jackson v. DeFabis*, 553 N.E.2d at 1218.

### B. "Transfers" to Kentucky Avenue and 86th Street

Martin Marietta claims that virtually every O.K. Sand employee has testified that O.K. Sand knew that Martin Marietta was "transferring" O.K. Sand products from O.K. Sand's Belmont facility to Martin Marietta's Kentucky Avenue facility, citing the deposition testimonies of Alice Huffman, George Kopetsky, Sr., George Kopetsky, Jr., Steve Kopetsky, Laura Kopetsky, and Brenda Cof-

fey. Martin Marietta claims that when it "transferred" O.K. Sand products to its Kentucky Avenue facility, the ticket on the O.K. Sand computer read "Martin Marietta Trans." Martin Marietta also points out that on August 9, 1985, Martin Marietta sent O.K. Sand a check with a short, explanatory note, which clearly indicated that Martin Marietta was "transferring" O.K. Sand's product to Martin Marietta's Kentucky Avenue plant:

> Gentlemen:
>
> Enclosed is our check for $182,225.27 for July shipments and an adjustment for May and June as shown on the attached schedule.
>
> The adjustment was due to material transferred to our Kentucky Ave. Sand plant at a price in excess of what was realized upon sale.
>
> Please call if you have any questions.
>
> Yours very truly,
>
> [signature]
>
> K.G. Miller
>
> Controller

Martin Marietta's Motion for Summary Judgment, Appendix II, tab 28.

Martin Marietta claims that O.K. Sand also knew the price Martin Marietta paid O.K. Sand for the "transferred" products. Because the ASPAP documents listed "transfers" on a separate line as a separate item, Martin Marietta again claims simple arithmetic would have yielded the average "transfer" price per ton. Citing Kopetsky's testimony, Martin Marietta claims that Kopetsky did such calculations during the term of the agency, and had concluded that on some occasions, the price for the transferred products "was mighty cheap" and "down pretty cheap." Kopetsky Deposition, p. 319.

Martin Marietta also claims that virtually everyone at O.K. Sand knew that Martin Marietta had created new names for two of O.K. Sand's products [18] and was selling the newly named products at prices lower than those charged at the 86th Street facility. In support of this contention, Martin Marietta again cites the deposition testimony of Steve Kopetsky, George Kopetsky, Larry Harris, Tari Eversole, and Brenda Coffey. Martin Marietta claims they all knew about the north side Indianapolis sales "because someone had to tell the truckers and loader the pile from which to fill an order for blow sand or mortar sand." Martin Marietta's Memorandum in Support of its Motion for Summary Judgment, p. 18.

■ O.K. Sand does not dispute that it knew Martin Marietta was "transferring" O.K. Sand's products to its Kentucky Avenue and 86th Street facilities. However, it is not entirely clear that O.K. Sand understood precisely what "transferred" meant or entailed:

Q. Did you know what transfers to Martin Marietta meant?

A. No, sir. I didn't know it meant selling it to them and them reselling it to someone else. I told you a while ago it meant, I thought, moving it to their yard and then them moving it to wherever they wanted to move it to.

Kopetsky Deposition, p. 434.

Q. Did you know that's what they were going to do with the sand that you were transferring is to sell it to their customers?

A. I was under the understanding that they was taking sand and gravel out of our place and selling it to a customer, being Rieth [sic] Riley, or whoever, direct to them.

Q. Did you understand that they were transferring it to their facility first?

A. I did not.

Kopetsky Deposition, p. 258.

Further, O.K. Sand has presented evidence to establish that, even if O.K. Sand understood that "transfers" meant purchases, O.K. Sand did not know what price Martin Marietta was charging itself for these "transfers." Kopetsky Deposition, p. 259. O.K. Sand also contends it was unable to obtain this information relating to the "transfers" Martin Marietta:

---

**18.** Martin Marietta renamed O.K. Sand's fill sand as "Blow Sand" and renamed O.K. Sand's mason sand as "Mortar Sand."

Q. Were you concerned about the fact you didn't know what was going on?

A. I was probably concerned, but I didn't know how to find out any answers what I was concerned about because they wouldn't never tell me nothing when I would ask them.

\* \* \* \* \* \*

A. ... Well, again, we couldn't ever seem to get any information,

Kopetsky Deposition, p. 268.

In contrast to information regarding the direct sales of O.K. Sand product, the AS-PAP documents referred to the "transferred" material acquired by Martin Marietta in a manner similar to the Invoice Registers, that is, by indicating only the number of total tons of O.K. Sand product that was "Transferred to MM" and the amount Martin Marietta paid for that gross tonnage. The ASPAP documents did not provide a breakdown of the specific product or the purchase price of each product.

Thus, despite the lack of a dispute over whether O.K. Sand knew that Martin Marietta was "transferring" O.K. Sand's product to both its Kentucky Avenue and 86th Street facilities, there is a genuine issue of material fact regarding whether O.K. Sand actually knew that Martin Marietta was selling to itself O.K. Sand's products at amounts below the authorized list prices or whether Martin Marietta was self-dealing in other ways. Even as late as June 1987, it is not at all clear that reasonable care and diligence would have alerted O.K. Sand to the fact that Martin Marietta was "transferring" O.K. Sand's products to itself at unauthorized prices. But, even if the Court were to find that the ASPAP documents were sufficient to establish constructive knowledge of the alleged improper transfers, a single renewal of the Sales Agency Agreement in the face of that constructive knowledge would not suffice as a basis for waiver, estoppel, or modification. *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d at 214; *Central States, Southeast and Southwest Areas Pension Fund v. Ekco Products, Inc.*, 581 F.Supp. at 378.

### C. Packaging

O.K. Sand claims that Martin Marietta was "packaging" O.K. Sand's products in a manner to allow it to sell its own products at higher profits to O.K. Sand's detriment. *See* Nicholson Deposition, p. 27–28. O.K. Sand's "packaging," or tying claims are thus merely a variation of its claims that Martin Marietta sold O.K. Sand products at more than 10% or 20% below the list prices. As such, O.K. Sand has established a genuine issue of material fact regarding whether O.K. Sand became aware of these alleged breaches prior to the "End of 1987, beginning of 1988," and waiver, estoppel, and modification, all of which first require that O.K. Sand had knowledge of the alleged breaches, do not bar O.K. Sand from bringing claims of improper "packaging."

### D. Fraud

■ O.K. Sand's fraud claim, Count V, is based on the contention that Martin Marietta had a legal or equitable duty to make certain pricing and purchasing disclosures, and that a "breach of a legal or equitable duty within the context of a fiduciary relationship may give rise to a cause of action for constructive fraud." *Sanders v. Townsend,* 582 N.E.2d 355, 358 (Ind.1991). Unlike actual fraud, an intent to deceive is not an element of constructive fraud; "instead, the law infers fraud from the relationship of the parties and the circumstances which surround them." *Id.* "Once it is established that one with a fiduciary duty has attempted to benefit from a questioned transaction, the law presumes fraud." *W & W Equipment Co. v. Mink,* 568 N.E.2d 564, 573 (Ind.Ct.App.1991) (citing *Dotlich v. Dotlich,* 475 N.E.2d 331, 342 (Ind. Ct.App.1985)).

■ Martin Marietta seeks summary judgment on Count V, contending that O.K. Sand had actual knowledge that Martin Marietta was selling O.K. Sand's products for more than 10% or 20% below list prices, and "O.K. Sand cannot rely on any alleged misrepresentations when it [knew] the facts." Memorandum in Support of Martin Marietta's Motion for Summary Judgment, p. 32. Martin Marietta cites the testimony of O.K. Sand's own accountant to the effect that the

information Martin Marietta did supply O.K. Sand was inconsistent with an attempt to conceal information or defraud O.K. Sand. Further, Martin Marietta maintains that it did not fail to disclose its own economic interests in the "transfers" of O.K. Sand's products, and O.K. Sand could not have reasonably relied on any alleged misrepresentation because it is "undisputed that O.K. knew about sales below the alleged minimum prices." *Id.* at 35.

Again, O.K. Sand clearly knew that its products were being "transferred." As previously established, however, O.K. Sand has demonstrated a genuine issue of fact regarding whether Martin Marietta told O.K. Sand the exact and self-dealing nature of the "transfers" so as to allow O.K. Sand to recognize them as being the self-dealing transactions they apparently were. Therefore, whether Martin Marietta was engaged in "self-dealing" and whether it committed constructive fraud by not disclosing to O.K. Sand the nature of the "transfers" is a disputed question of fact, and Martin Marietta's motion for summary judgment in this regard is without merit.

### E. Conversion

Martin Marietta also moves for summary judgment on Count VI, O.K. Sand's (criminal) conversion count, claiming that O.K. Sand specifically authorized Martin Marietta to control and sell O.K. Sand products, even to itself. Since it had the authority to sell O.K. Sand products, Martin Marietta claims, O.K. Sand cannot establish an essential element of its conversion claim, that Martin Marietta exercised unauthorized control.

In response, O.K. Sand claims that the Sales Agency Agreement neither prohibited Martin Marietta from purchasing O.K. Sand's products for itself (as long as it purchased the products for no more than 10% or 20% below the authorized list price) nor authorized it. However, O.K. Sand argues that as a fiduciary, Martin Marietta was not allowed to "self-deal" without O.K. Sand's knowledge and approval, citing Restatement (Second) of Agency § 389 (1958).

In a buyer-seller relationship between principal and agent, "an irreconcilable ten-sion exists between the interest the buyer and sell each have in obtaining the maximum financial advantage for himself in dealing with the other, and the agent's duty to act solely to the principal's advantage in preference to his own." *Construction Techniques, Inc. v. Dominske,* 928 F.2d 632, 636 (4th Cir.1991). Absent a full disclosure to the principal, this tension renders a fully faithful agency impossible, and as such, "the law forbids an agent to 'buy from or sell to himself.'" *Id.;* Restatement (Second) of Agency § 389 comment a (1958).

■ Martin Marietta is correct in stating that the Sales Agency Agreement gave it the authority to take control of O.K. Sand's products. But, as O.K. Sand's agent, Martin Marietta did not have the authority to engage in self-dealing without O.K. Sand's authorization. *Construction Techniques, Inc. v. Dominske,* 928 F.2d at 636. Because O.K. Sand has demonstrated a genuine issue of fact regarding whether Martin Marietta adequately informed O.K. Sand of the nature of the "transfers," Martin Marietta's motion for summary judgment in this regard must be denied.

### F. Fraudulent Concealment

Finally, Martin Marietta contends that O.K. Sand's claims are barred, at least in part, by the statute of limitations. It argues that those claims subject to a two-year statute of limitations are barred, to the extent they arose before April 24, 1988, unless O.K. Sand can establish fraudulent concealment.

■ Indiana's fraudulent concealment statute, Ind.Code § 34–1–2–9 provides that:

If any person liable to an action shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the limitation after the discovery of the cause of action.

Fraudulent concealment, in a confidential or fiduciary context, can arise from either active effort to conceal or from a failure to disclose material information. *Keesling v. Baker & Daniels,* 571 N.E.2d 562, 565 (Ind.Ct.App. 1991).

In light of this Court's modification of its earlier entry, (*supra*, p. 15, *et seq.*), Martin Marietta's motion on this point is substantially moot; O.K. Sand's claims that Martin Marietta breached the specifics of the Sales Agency Agreement (by selling and quoting O.K. Sand's products for more than 10% or 20% below the list prices) are subject to a ten-year, not a two-year period of limitations. Further, with regard to Martin Marietta's alleged failure to disclose its self-dealing with regard to "packaging," O.K. Sand has established a genuine issue of material fact regarding whether Martin Marietta concealed this information from O.K. Sand throughout the term of the agency.

However, with regard to O.K. Sand's claims that Martin Marietta failed to disclose that the "transfers" were in fact self-purchases, O.K. Sand has failed to present evidence that Martin Marietta concealed from O.K. Sand, after June 1987, that it was self-purchasing O.K. Sand's products. By June 1987, whether it was from the 1985 explanatory note, the computer sales tickets, the ASPAP documents (the ASPAP documents clearly indicate that Martin Marietta was purchasing O.K. Sand's products), or from various other cited sources, virtually every O.K. Sand employee, including Kopetsky, knew that Martin Marietta was purchasing O.K. Sand's products. Although the claims that Martin Marietta bought O.K. Sand's products for itself at unauthorized prices survive, the claims that Martin Marietta breached its fiduciary duties by simply purchasing O.K. Sand products are subject to a two-year statute of limitations. O.K. Sand's claims that Martin Marietta violated the Sales Agency Agreement by merely "transferring"/purchasing O.K. Sand's products are therefore barred, to the extent they arose prior to April 24, 1988 (the complaint was filed on April 24, 1990.)

### III.

O.K. Sand's Motion for Summary Judgment

The Court now turns to O.K. Sand's motion for summary judgment, in which O.K. Sand claims that Martin Marietta cannot prove that it has suffered or will suffer any antitrust injury and that Martin Marietta lacks standing to bring an action under Sections 1 and 2 of the Sherman Act.

Martin Marietta rejoins by arguing that it has suffered an antitrust injury in three respects. First, it claims that O.K. Sand terminated the Sales Agency Agreement with Martin Marietta to allow O.K. Sand to enter an illegal, anticompetitive agreement with American Aggregates, and, citing *Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1563–64 (7th Cir.), *cert. dismissed*, —— U.S. ——, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991), "the Seventh Circuit held that harm caused by the termination of an existing relationship, resulting from an illegal agreement, is sufficiently caused by the violation to establish standing." Martin Marietta thus claims it has standing because O.K. Sand terminated the O.K. Sand/Martin Marietta agency relationship in order to enter into an illegal relationship with American Aggregates. *See* Martin Marietta's Counterclaim, ¶¶ 65, 66, and 74.

Martin Marietta next claims that it has standing as an injured competitor (*see* Martin Marietta's Counterclaim, ¶ 62) and as a former consumer (because it paid a "higher price" for sand and gravel in 1990 and 1991 and therefore "Martin Marietta is a victim of higher prices.") *See* Martin Marietta's Memorandum in Opposition to O.K.'s Motion for Summary Judgment, p. 25.

In order to prevail under the Sherman and Clayton Acts, an antitrust plaintiff shoulders a heavy burden of proof. In *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court stated that an antitrust plaintiff:

> must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove an *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* at 489, 97 S.Ct. at 697–98.

"Congress did not intend the antitrust laws to provide a remedy in damages for all inju-

ries that might conceivably be traced to an antitrust violation." *Associated General Contractors Inc., v. California State Council of Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 906, 74 L.Ed.2d 723 (1983) (quotations omitted). An antitrust plaintiff must establish that the plaintiff's harm was proximately caused by the alleged antitrust violation. *Nelson v. Monroe Regional Medical Center,* 925 F.2d 1555, 1563 (7th Cir.1991); *Fischer v. NWA, Inc.,* 883 F.2d 594, 599 (8th Cir. 1989). Unless an antitrust plaintiff can establish that its injury was caused by conduct that violates the antitrust law(s), a plaintiff lacks standing, under Section 4 of the Clayton Act, to bring an antitrust lawsuit. *Fischer v. NWA, Inc.,* 883 F.2d 594, 599 (8th Cir.1989). "The threshold requirement of an antitrust injury reflects the Supreme Court's frequently stated maxim that Congress enacted the antitrust laws to protect competition, not competitors." *Id.* (citing *Brunswick*).

### A. Standing as a prior agent/distributor—the "lost profits" theory

■ An antitrust plaintiff may establish standing by showing that a supplier terminated its agency agreement as part of a conspiracy to price-fix with someone else. *Morrison v. Murray Biscuit Co.,* 797 F.2d 1430 (7th Cir.1986); *Engine Specialties, Inc. v. Bombardier, Ltd.,* 605 F.2d 1, 14–15 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980); *see Barber & Ross Co. v. Lifetime Doors, Inc.,* 810 F.2d 1276 (4th Cir.1987) ("A buyer who is injured due to a refusal to deal in furtherance of the seller's anticompetitive scheme has been injured as a direct result of an antitrust violation."), *cert. denied,* 484 U.S. 823, 108 S.Ct. 86, 98 L.Ed.2d 48 (1987). "While the termination of a supply contract under proper circumstances is not forbidden by the antitrust laws, it is undisputed that a cancellation in the context of the alleged anticompetitive conspiracy would constitute a *per se* Sherman Act violation." *Lee–Moore Oil Co. v. Union Oil Co.,* 599 F.2d 1299, 1301 (4th Cir.1979). To establish an antitrust in-

jury under this "lost profits" theory, a plaintiff must demonstrate that "his termination could be attributed to the [illegal] agreement." *Morrison v. Murray Biscuit Co.,* 797 F.2d 1430, 1439 (7th Cir.1986)

■ In support of Martin Marietta's claim that it was terminated because O.K. Sand wanted to price-fix with American Aggregates, Martin Marietta claims it is undisputed that "O.K. was perfectly satisfied with Martin Marietta's performance" up until the point of termination, and therefore O.K. Sand must have terminated Martin Marietta so it could price-fix with American Aggregates. Martin Marietta's Memorandum in Opposition to O.K. Sand's Motion for Summary Judgment, p. 18. In support of this claim, Martin Marietta states in its memorandum, "Despite all this actual and constructive knowledge [that Martin Marietta was selling O.K. Sand's product below list prices], Mr. Kopetsky never complained to Martin Marietta (Kopetsky, Sr. Dep. pp. 317, 321, 383 and 385)." Martin Marietta later states in its memorandum:

> Despite knowing of the sales below the alleged minimums, transfers, and north side sales, Mr. Kopetsky never complained to Martin Marietta [cite]. In 1987, he knew the transfers prices and average prices were below the alleged minimums and did not complain [cite]. He never told Martin Marietta that he was thinking of terminating the agreement [cite]. Laura Kopetsky, Steve Kopetsky, and Cathy Demaree all said Mr. Kopetsky seemed happy the entire time [cite]. George, Jr. said George, Sr. seemed happy until February, 1988, when he learned that Martin Marietta gave George, Jr. a higher price for O.K.'s fill sand than it gave to one of his competitors.
>
> Mr. Kopetsky had reason to be happy.... during the time Martin Marietta represented O.K., O.K.'s net worth went from $330,000 to over $1,000,000 [cite].

Apparently, Martin Marietta equates "never complained" with "perfectly satisfied." [19]

**19.** Martin Marietta also submits evidence that O.K. Sand was "very well satisfied" and profitable in 1986 and 1987. However, whether O.K.

Sand was satisfied and profitable prior to September of 1988, when Martin Marietta claims O.K. Sand started making plans to switch to AA,

However, even if O.K. Sand did not complain to Martin Marietta about its performance, which it claims it did, that would not necessarily demonstrate perfect satisfaction, and it most definitely does not establish that O.K. Sand failed to renew or canceled the O.K. Sand/Martin Marietta agency agreement to commit antitrust violations with American Aggregates. Martin Marietta's assumption that "no news is good news," or rather, "no news is good antitrust news" fails to establish the necessary connection between the agency termination and the alleged antitrust violation.[20]

To survive O.K. Sand's motion for summary judgment, Martin Marietta must establish either as a fact or that there is a genuine issue of fact regarding causation: that O.K. Sand terminated the O.K. Sand/Martin Marietta agreement so it could price-fix with American Aggregates. Because Martin Marietta has failed to produce any evidence to establish that the O.K. Sand/Martin Marietta agreement would not have been terminated but for the alleged O.K. Sand/American Aggregates price fixing scheme and that the subsequent illegal agreement was the cause of Martin Marietta "lost profits" injury, Martin Marietta has failed to establish an antitrust injury under its "lost profits" theory. *See Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1563 (7th Cir.1991); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1439 (7th Cir.1986).

### B. Standing as an injured competitor.

Martin Marietta next claims that it has standing to bring its antitrust counterclaims as a competing "producer and seller" of sand and gravel. *See* Martin Marietta's Memorandum in Opposition to O.K. Sand's Motion for Summary Judgment, p. 5, fn. 4. In its Counterclaim, Martin Marietta characterizes its injuries as a competitor in three contexts: as a harvester and seller of sand and gravel

in the southern Indianapolis area (in ¶ 5); as a victim of the O.K. Sand/American Aggregates' increased sand and gravel prices which "adversely affect[ed] the ability of Martin Marietta to compete in that market …" (in ¶ 62); and finally, as a victim of a more generalized foreclosure of commercial competition (in ¶ 64.)

In its Memorandum in Opposition to O.K. Sand's Motion for Summary Judgment, Martin Marietta claims that it "produced sand and gravel at its Kentucky Avenue facility until 1990," and "has been a seller of sand and gravel in southern Indianapolis from 1989 to the present [cite]." *See* Martin Marietta's Memorandum in Opposition to O.K. Sand's Motion for Summary Judgment, p. 5, fn. 4. Martin Marietta further claims that after O.K. Sand's products were no longer available to it, it began purchasing sand and gravel from Waverly Sand and Gravel, a producer outside the southern Indianapolis market, and thus incurs increased transportation costs to import the product from Waverly to southern Indianapolis, which precludes Martin Marietta from competing effectively in the market.

Martin Marietta asserts that as a competitor, it is suffering an antitrust injury in fact. It claims that because O.K. Sand can "lower prices at will," Martin Marietta cannot risk the capital to develop its reserves, and Martin Marietta must therefore haul sand and gravel from Waverly "at a prohibitive transportation charge." Martin Marietta concludes that the O.K. Sand/American Aggregates agreement has adversely affected Martin Marietta's ability to compete, thus causing an antitrust injury for which Martin Marietta has standing to sue.

Citing *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2nd Cir.), *cert. denied*, 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989), Martin Marietta alternatively argues that be-

---

is largely irrelevant. Of course O.K. Sand was at least partially satisfied with Martin Marietta from 1985 to 1988, when it allowed the agency agreement to renew each of those years. The relevant inquiry is why O.K. Sand terminated or refused to renew the agency agreement in January of 1989.

**20.** Even if the Court assumes that O.K. Sand was happy with Martin Marietta up until the point of termination, that is not evidence that O.K. Sand terminated the agency agreement to price fix with American Aggregates; under the agency agreement O.K. Sand could have terminated the agency agreement (under the explicit terms of the Sales Agency Agreement) for no reason at all.

cause "the post-combination market share of O.K. and American Aggregates is 75%, which is *prima facie* evidence of monopoly power," it does not need to show any antitrust injury because the Court should presume an antitrust injury to competitors like Martin Marietta.

■ The concept of "antitrust injury" is related to the commonly understood standing requirement, but is not identical to it. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 532 (7th Cir.1986).

> Injury in fact establishes standing under Article III of the Constitution.... Antitrust injury is a different beast. The antitrust laws throttle some cooperative behavior of producers to preserve the benefits of competition for consumers. Producers often complain about the efforts of business rivals, which reduce their profits. [Citations]. Judicial relief from the real injuries caused by rivalry would harm the consumers the antitrust laws are supposed to protect. [Citations]. The doctrine of [*Atlantic Richfield,*] [*Cargill,*] and [*Brunswick*], requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers.

*Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 961 F.2d 667, 669–70 (7th Cir.1992). An antitrust plaintiff's injury must be related to the concerns that underlie the Sherman Act. "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust law were intended to prevent and that flow from that which makes defendant's act unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977); *see Matsushita Electrical Industrial Co., v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (plaintiffs did not suffer antitrust injury when defendants conspired to artificially inflate prices because, as sellers in the same market, they tended to benefit from the violation).

■ Martin Marietta's claims distill down to the contention that, as a competitor, it has been injured by higher prices and reduces sales. However, price increases do not in and of themselves, constitute an antitrust

harm against competitors; predatory pricing—that is, pricing below an appropriate measure of cost for the purpose of eliminating competition in the short run and reducing competition in the long run—constitutes such an antitrust harm. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341 fn. 10, 110 S.Ct. 1884, 1892–93, fn. 10, 109 L.Ed.2d 333 (1990); *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116, 107 S.Ct. 484, 492, 93 L.Ed.2d 427 (1986). Martin Marietta has established that is has suffered a decline in sales, "but a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." *Stamatakis Industries, Inc., v. King*, 965 F.2d 469, 471 (7th Cir.1992). Unfair competition is nonetheless competition; "ruthless, unprincipled, uncharitable, unforgiving—and a boon to society, Adam Smith reminds us, precisely because of these qualities that make it a bane to other producers." *Id.* (citing *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1268 (7th Cir.1992)).

A competitor challenging an allegedly monopolistic or anticompetitive merger or conspiracy must show that it suffers an antitrust injury from artificially low prices.

> For purposes of [a Sherman § 1 case], it is enough to note that respondents have not suffered an antitrust injury unless competitors conspired to drive respondents out of the relevant markets by (i) pricing below the necessary level to sell their products, or (ii) pricing below some appropriate measure of cost. An agreement with these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices. Respondents therefore may not complain of conspiracies, that, for example, set maximum prices above market levels, or that set minimum prices at *any* level.

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. at 584, fn. 8, 106 S.Ct. at 1355, fn. 8 (emphasis in original); *see Atlantic Richfield*, fn. 10 (*Matsushita*'s fn. 8 is the proper statement of the law). Martin Marietta's claim that it has suffered a com-

petitor's antitrust injury from higher prices is thus without merit.

■ Further, Martin Marietta's argument that the Court should presume an antitrust injury under *Bigelow,* is also without merit. The *Bigelow* court held that as long as a post-merger combination holds a substantial monopoly market share, the threat of predatory pricing is sufficient to establish an antitrust injury. However, in *Atlantic Richfield,* decided after *Bigelow,* the Supreme Court expressly rejected the contention that any loss flowing from a *per se* violation satisfies the antitrust injury requirement, *id.* at 1889, holding to the contrary that "proof of a *per se* violation and of antitrust injury are distinct matters that must be shown independently." *Id.* 495 U.S. at 344–46, 110 S.Ct. at 1894; *Remington Products, Inc. v. North American Philips Corp.,* 755 F.Supp. 52, 58 (D.Conn.1991). An antitrust injury cannot be simply presumed. *Id.*

■ Finally, Martin Marietta's speculation or prediction that O.K. Sand might engage in predatory pricing, without more, is simply not enough to establish an antitrust injury. *See Phototron Corp. v. Eastman Kodak Co.,* 842 F.2d 95 (5th Cir.1988). "To withstand judgment as a matter of law, a plaintiff must have other evidence, either objective or subjective, of predatory intent." *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1503 (11th Cir.1988) (citing *Matsushita*), *cert. denied,* 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989). "The mere utterance of sincere fear" that predatory pricing will occur is insufficient. *See* P Areeda & H. Hovenkamp, *Antitrust Law,* ¶ 340.2 at 451 (Supp.1991).

> At the very least, ... the tribunal should not find a significant risk of predation without proof that the market circumstances would make predation economically feasible—namely, (1) the ability of the would-be predator to destroy all or most of his rival and (2) the ability thereafter to maintain monopoly pricing long enough to recoup the losses (often enormous) of destroying rivals.

*Id.; see Phototron Corp. v. Eastman Kodak Co.,* 842 F.2d 95 (5th Cir.), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1996, 100 L.Ed.2d 228 (1988). In addition to allegations that "prices might dip below costs," in *Cargill,* the Court commented that a plaintiff must establish whether a defendant is capable of successfully pursuing a predatory scheme; "Courts should not find allegations of predatory pricing credible when the alleged predator is incapable of successfully pursuing a predatory scheme." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. at 119 fn. 15, 107 S.Ct. at 494 fn. 15. There must be a "significant probability" that an antitrust violation will occur; "the notion that merely facing the specter of a monopoly is enough to create standing in a competitor is not the law." *Phototron Corp. v. Eastman Kodak Co.,* 842 F.2d at 100.

Here, Martin Marietta does not argue that O.K. Sand is capable of successfully pursuing a predatory scheme. Nor does Martin Marietta allege that O.K. Sand and American Aggregates has or will engage in pricing that is *predatory.* Martin Marietta states only that O.K. Sand and American Aggregates have the "power to lower prices at will," which, of course, would be the predictable, economically rational, and competitive thing to do when a market's supply increases. Further, Martin Marietta has demonstrated no evidence of a predatory intent. *See McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1502 (11th Cir.1988). Martin Marietta's unsubstantiated fears that O.K. Sand will "lower its prices at will" are simply insufficient to establish an antitrust injury or standing.

### C. Antitrust injury as a consumer.

Martin Marietta contends that it is a former consumer of sand and gravel: "from mid–1990 to April 1991, Martin Marietta purchased sand and gravel from Waverly for resale to on-site customers at its Kentucky Avenue facility." On this basis, Martin Marietta maintains that it suffered an antitrust injury, because "Martin Marietta is a victim of higher prices." This allegation is contained only in Martin Marietta's brief in opposition to its motion for summary judgment, not in its Counterclaim. Martin Marietta's Counterclaim alleges only that Martin Mar-

ietta, as a terminated agent and as a competitor, suffered an antitrust injury.

■ "The question of standing is a preliminary one, to be answered from examination of the allegations of the complaint." *Transource International, Inc. v. Trinity Industries, Inc.*, 725 F.2d 274, 280 (5th Cir. 1984) (citing *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1168 (5th Cir. 1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980)). From a technical standpoint, the Court should not consider and resolve the question of whether Martin Marietta has standing as an injured consumer because that basis for standing was not raised in the Counterclaim. From a equitable standpoint, the Court is not impressed by Martin Marietta's argument that, rather than as a producer and/or dealer of sand and gravel, it has standing as a consumer "for resale." As a consumer for resale, Martin Marietta at best is a competing dealer, and a competing dealer suffers no antitrust injury when a defendant charges prices which are higher than competitive, market prices. *Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. at 337–39, 110 S.Ct. at 1890; *see Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. at 360, fn. 16, 110 S.Ct. at 1902, fn. 16 (a potential dealer, not strictly a dealer or a competitor, has standing when a defendant attempts to underprice his sales).

Many people who probably believe that maximizing allocative efficiency should be the exclusive goal of antitrust, *state* that the goal of antitrust should be to maximize the welfare of consumers....

There is more than a little chicanery in such terminology, however. Although "maximizing consumer welfare" is an appealing term, its content is ambiguous. To say that antitrust should maximize consumer welfare is one thing; to discern an antitrust policy that will do it is quite something else. In fact, the consumer welfare principle is predicated on the observation that *everyone* is a consumer.... Since all of us are consumers, however, an antitrust policy of maximizing consumer welfare is really a policy of maximizing everyone's welfare—at least in their capacity as consumers.

Herbert Hovenkamp, *Economics and Federal Antitrust Law*, Hornbook Series, Lawyer's Edition, p. 49 (1985) (emphasis in original).

■ Up to this point, Martin Marietta has consistently represented itself to be a competitor or distributer, not an ultimate consumer of sand and gravel. Even if the Court were to accept Martin Marietta's self-characterization as a consumer of sand and gravel, Martin Marietta has still not established standing, as it has not established that it has paid a monopolistic or above-market price based on or because of O.K. Sand's antitrust violation. Martin Marietta has not established a causal connection between its alleged consumer injury and any antitrust violation. *Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. at 335–37, 110 S.Ct. at 1889.

Martin Marietta has failed to establish that it has suffered an antitrust injury as a terminated dealer or as a competitor and has failed to assert in its Counterclaim that as a consumer, it has suffered an antitrust injury. Martin Marietta has also failed to demonstrate a connection between a consumer injury and the alleged antitrust violation. Martin Marietta has demonstrated no antitrust injury and thus lacks standing to litigate its antitrust counterclaims, and the antitrust counterclaims must therefore be dismissed.

### III. Conclusion

Martin Marietta has failed to demonstrate any genuine issue of material fact regarding whether it suffered an antitrust injury. O.K. Sand's motion for summary judgment on Martin Marietta's antitrust counterclaims is therefore GRANTED. O.K. Sand has requested an opportunity for an "Oral Presentation," and that motion is DENIED.

Because O.K. Sand has established genuine issues of material fact regarding its complaint, the Court DENIES Martin Marietta's motion for summary judgment, with one exception. O.K. Sand is not entitled to persist in its claim of fraudulent concealment with regard to its contention that Martin Marietta violated its fiduciary duties by purchasing O.K. Sand's products for itself. In that one

regard, Martin Marietta's motion for summary judgment is GRANTED. Further, for the reasons and to the extent stated in Section I. of this entry, the Court MODIFIES its earlier ruling, now holding that with regard to those parts of O.K. Sand's complaint which allege that Martin Marietta breached the Sales Agency Agreement by selling O.K. Sand's products for more than 10% to 20% below the applicable "List Prices," those claims are subject to a ten-year, not two-year, year statute of limitations.

It is so ORDERED.

## ON MOTIONS TO RECONSIDER

Martin Marietta has filed two motions to reconsider, both of which stem from this Court's previous Entry of September 18, 1992. Martin Marietta's second motion to reconsider, its Motion to Reconsider Order Denying Martin Marietta's Motion for Summary Judgment, is a reassertion of the same arguments it made in its previous motion for summary judgment, and for the reasons stated in this Court's previous entry, that motion to reconsider is denied. Martin Marietta's first motion to reconsider, the Motion to Reconsider Order Granting O.K.'s Motion for Summary Judgment, for the reasons discussed below, prompt the Court's affirmance of its prior order.

### I. Background

In March of 1992, O.K. Sand moved for summary judgment on the basis that "a core defect common to [the antitrust] claims is Martin Marietta's incurable inability to assert or prove that it has suffered or will suffer any 'antitrust injury.'" That motion for summary judgment focused on Martin Marietta's inability to establish standing either as a competitor or consumer of O.K. Sand's products, but also, although somewhat unartfully, it argued that Martin Marietta failed to present evidence to establish standing under its "lost profits" theory, citing *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430 (7th Cir.1986). Martin Marietta filed a response to that motion; O.K. Sand filed a reply to that response, and upon review of those filings, this Court held that Martin Marietta had in fact failed to establish standing, either as a competitor or consumer. The Court also ruled that, with regard to Martin Marietta's "lost profits" theory of standing, Martin Marietta failed to present facts in support of its claim that O.K. Sand terminated the O.K. Sand/Martin Marietta agency agreement as part of an antitrust scheme—that O.K. Sand would not have terminated Martin Marietta's agency but for O.K. Sand and American Aggregates' antitrust scheme.

■ In Martin Marietta's motion to reconsider, Martin Marietta claims that this Court granted summary judgment "on grounds different from those relied on by O.K. [Sand] and thus to which Martin Marietta had no reason to (and did not) respond." Memorandum in Support of Martin Marietta's Motion to Reconsider Order Granting O.K.'s Motion for Summary Judgment, p. 3 (parens in original). Martin Marietta also claims that it did not brief the issue of whether O.K. Sand would not have terminated the Martin Marietta agency agreement but for its antitrust scheme with American Aggregates, because it was relying on O.K. Sand's "stipulat[ion]" [1] to the truth of the allegations made in Martin Marietta's counterclaim. [2] Martin Marietta went on to brief its "lost profits" theory in its motion for reconsideration and, "[f]or the Court's convenience," attached to its brief evidence claiming to demonstrate that O.K. Sand "terminated its agreement with Martin Marietta in order to enter into the illegal agreement with American Aggregates." *Id.* at p. 4, n. 3.

---

1. O.K. Sand stated on page two of its brief in support of its motion for summary judgment: For purposes of O.K.'s Motion and this brief, all of Martin Marietta's factual allegations are assumed to be true except those allegations that amount to characterizations of the written agency agreements (1) between O.K. and Martin Marietta and (2) between O.K. and American Aggregates.

2. Whether or not O.K. Sand previously stipulated as to the truth of Martin Marietta's counterclaim allegations, O.K. Sand has since retracted any such stipulation, and Martin Marietta cannot now claim to rely on that statement to stave off summary judgment.

In response to Martin Marietta's motion to reconsider, O.K. Sand denies that it "stipulated" that the American Aggregates agency agreement constitutes a price-fixing scheme and an illegal agreement to terminate Martin Marietta and claims that it "specifically refused to given even a conditional acceptance of Martin Marietta's allegations about the agency agreements." O.K. Sand also asserts that the evidence Martin Marietta attaches to its brief is the same evidence that the Court already considered in its previous entry and found insufficient as a matter of law.

## II. Discussion

In Martin Marietta's original opposition to O.K. Sand's motion for summary judgment, Martin Marietta submitted a chart summarizing Martin Marietta's annual performance under the Sales Agency Agreement, and presented evidence to support the following assertions:

Mr. Kopetsky was happy the entire time Martin Marietta acted as O.K.'s sales agent;

Laura Kopetsky, Steve Kopetsky, and Cathy Demaree all said Mr. Kopetsky seemed happy the entire time;

Shortly after O.K. acquired a dredge in January, 1986, Steve Zelnak, the President of Martin Marietta Aggregates, visited O.K. Mr. Kopetsky told Mr. Zelnak that he was "very well satisfied";

Mrs Kopetsky told William Cox that he was proud O.K. had sold over 1 million tons of products in 1986;

On several occasions, Mr. Kopetsky told John Schuler that things were going fine;

In December, 1987, Mr. Kopetsky told Mr. Schuler that he was happy with Martin Marietta's 1987 performance and that O.K. had made money;

Mr. Kopetsky never complained to Martin Marietta;

He never told Martin Marietta that he was thinking to terminating the agreement; and

O.K. knew Martin Marietta was running low on reserves at Kentucky Avenue in 1988, and in September, 1988, Mr. Kopetsky contacted American Aggregates about replacing Martin Marietta as O.K.'s sales agent. Martin Marietta exhausted its existing reserves at its Kentucky Avenue facility.

In that opposition, Martin Marietta went on to recount that Kopetsky contacted American Aggregates about replacing Martin Marietta, that Blankenship took over the American Aggregates negotiations, and that on April 27, 1989, O.K. Sand and American Aggregates signed the "Agreement Regarding Mining, Sales, and Administrative Services." Martin Marietta also block quoted (in bold) four lines from Blankenship's deposition and recounted that in response to the question of why O.K. Sand wanted American Aggregates to restrict its sales to on-site customers, Blankenship said: "Being greedy, I guess."

In that same brief, Martin Marietta also argued:

The Court should deny O.K.'s motion because the facts show Martin Marietta has standing and has suffered antitrust injury three ways. First Martin Marietta was directly injured when O.K. terminated the parties' relationship to enter an illegal agreement....

*Id.* at p. 16. On the following page of its brief, under the centered and underlined caption, "*Martin Marietta Has Standing And Has Suffered Antitrust Injury, Because O.K. Terminated The Sales Agency Agreement To Enter An Anticompetitive Agreement,*" Martin Marietta began a five page factual and legal argument in support of its "lost profits" theory. Martin Marietta concluded the factual analysis of that section by stating:

Because Martin Marietta has shown that its performance was acceptable as a matter of law, if O.K. has no other reason for the termination, it must have terminated Martin Marietta to enter the illegal agreement with American Aggregates. The case is appropriate for summary judgment, but in Martin Marietta's favor on O.K.'s antitrust liability.

*Id.* at p. 19.

Nevertheless, in its motion to reconsider, not only does Martin Marietta claim that it never before argued or presented facts in support of this issue, it reasserts, in the same

language, using the same phraseology, in essentially the same order, the same facts it presented in its earlier response. For example, in the appendix attached to the motion to reconsider, Martin Marietta produces the same chart as it originally cited in its response to the motion for summary judgment and lists the following assertions:

8. Mr. Kopetsky was happy with Martin Marietta's performance the entire time (Deposition of Laura Kopetsky, p. 88; Deposition of Steve Kopetsky, pp. 48–49 and 70; Deposition of Cathy Demaree, pp. 62 and 64).

9. Shortly after O.K. Acquired a dredge in January, 1986, Steve Zelnak, the President of Martin Marietta Aggregates, visited O.K. Mr. Kopetsky told Mr. Zelnak that he was "very well satisfied";

10. Mrs Kopetsky told William Cox that he was proud O.K. had sold over 1 million tons of products in 1986;

11. On several occasions, Mr. Kopetsky told John Schuler that things were going fine;

12. In December, 1987, Mr. Kopetsky told Mr. Schuler that he was happy with Martin Marietta's 1987 performance and that O.K. had made money;

16. Mr. Kopetsky never complained to Martin Marietta;

17. Mr. Kopetsky never told Martin Marietta that he was thinking to terminating the agreement;

18. In 1988, O.K. knew Martin Marietta was running low on reserves at Kentucky Avenue; and

19. In September, 1988, Mr. Kopetsky contacted American Aggregates about replacing Martin Marietta as O.K.'s sales agent.

Also, as it did in its previous response, Martin Marietta again recounts how Kopetsky made the initial contact with American Aggregates, after which Blankenship took over the American Aggregates negotiations, and that O.K. Sand entered into an agency agreement with American Aggregates on April 27, 1989. Martin Marietta then block quoted, again in bold, the same four lines from Blankenship's deposition and restated Blankenship's "Being greedy, I guess" response.

Despite Martin Marietta's disingenuous contention that it did not previously brief this issue, it nevertheless claims that it did not have the opportunity to *fully* present this issue before the Court. Indeed, this *is* a complex issue which O.K. Sand did not brief well in its motion for summary judgment. For all these reasons, the Court grants the motion for reconsideration of the "lost profits" standing issue.

Having reviewed and re-reviewed all of the parties' filings, including the parties' most recent reconsideration filings, the Court concludes that Martin Marietta has failed to present sufficient evidence to establish antitrust standing under its "lost profits" theory. As stated in the Court's previous entry, one way to establish an antitrust injury is to present evidence that the "but for" cause of an agent's termination was a price-fixing scheme, that an agent's termination was caused by and pursuant to a conspiracy to price-fix. *Morrison v. Murray Biscuit,* 797 F.2d 1430 (7th Cir.1986). *See Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 1472–73, 79 L.Ed.2d 775 (1984) ("The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.").

 In light of the requirement that an antitrust litigant present direct or circumstantial evidence that reasonably tends to prove that a manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective, Martin Marietta's evidence that (1) O.K. Sand was satisfied with Martin Marietta's performance sometime prior to terminating the Sales Agency Agreement, (2) did not complain about Martin Marietta's performance, and (3) is "greedy," is insufficient to establish the necessary circumstantial link between Martin Marietta's termination and

the alleged antitrust conduct [3]—especially when O.K. Sand had the right to terminate the agency for any or no reason at all. Even if the Court were to assume that Martin Marietta's evidence established that O.K. Sand decided to terminate Martin Marietta so it could proceed to and (or try to) price-fix with American Aggregates, Martin Marietta has still failed to support its claim that the termination was part of an antitrust scheme, a showing required under the holdings in *Murray Biscuit* and *Monsanto*.

■ To establish standing under its "lost profits" theory, Martin Marietta must, but fails to produce evidence linking the termination of its contract to an alleged antitrust scheme, that is, that an antitrust scheme was in place at the time of the termination and that Martin Marietta was terminated pursuant to and as part of that scheme. Rather, the evidence Martin Marietta submits in support of its position demonstrates that O.K. Sand did not conspire with American Aggregates to terminate Martin Marietta as part of an antitrust scheme. Martin Marietta presented evidence that Kopetsky, on behalf of O.K. Sand, sought out American Aggregates to *replace* Martin Marietta; O.K. Sand had decided to replace Martin Marietta prior to meeting with American Aggregates. Blankenship, p. 129; *see* Martin Marietta's Reply Memorandum, p. 7 (Mr. Kopetsky contacted American Aggregates in September, 1988, about replacing Martin Marietta as O.K.'s sales agent). Assuming Kopetsky had decided to terminate Martin Marietta prior to

meeting with American Aggregates, the decision to terminate the *Martin Marietta* agency agreement could not, as a matter of law, be part of an American Aggregates/O.K. Sand conspiratorial scheme.

Martin Marietta's contention relating to the time O.K. Sand decided to terminate Martin Marietta is somewhat illusive since it also argues that, according to American Aggregates, Blankenship might have said (at some unknown point) that "there had been no decision made" concerning whether O.K. Sand had decided to terminate its relationship with Martin Marietta. *See* Harmon Deposition, p. 115. Martin Marietta's claims are nonetheless subject to summary judgment, however, because, even if O.K. Sand had not yet made the decision to terminate the Martin Marietta agency when it first met with American Aggregates, Martin Marietta has failed to provide any evidence that O.K. Sand and American Aggregates together agreed to price-fix prior to Martin Marietta's termination or that Martin Marietta's termination was part of and pursuant to a collusive conspiracy. Martin Marietta has presented evidence that American Aggregates and O.K. Sand were negotiating the terms of an agency agreement. However, Martin Marietta's claim fails because Martin Marietta has not presented evidence that O.K. Sand and American Aggregates, in the preliminary, pre-termination negotiations, agreed to price-fix, and that Martin Marietta would have been terminated as part of or in furtherance of that agreement.[4]

3. Martin Marietta relies heavily on *Monsanto* in its motion to reconsider this point, yet its discussion of that case is somewhat misleading. In *Monsanto*, after concluding that there was evidence of collusion between a supplier and at least one or more of its distributors, *id.* at 765, the relevant question became whether there was "circumstantial evidence of . . . a link" between that illegal agreement and the decision to terminate one of its distributors. *Id.* at 767. Upon review of the evidence, the Supreme Court found that there was sufficient evidence to support such a link, and, as stated in Martin Marietta's motion to reconsider, the Court considered relevant the "addition[al]" evidence that the supplier never before discussed with the terminated distributor the reasons stated for the distributor's termination. *Id.* Martin Marietta failed to point out, however, that the antitrust plaintiff in *Monsanto* had first presented evidence that other price-

fixing distributors had complained about its fellow distributor's low prices and that the price-fixing supplier's officials had made explicit threats to terminate the distributor unless it raised its prices and went along with the price-fixing scheme. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. at 767–68, 104 S.Ct. at 1472–73. Martin Marietta has presented no such price-fixing scheme evidence here.

4. Martin Marietta claims that "O.K.'s counsel began negotiating an agreement with American Aggregates," Martin Marietta's Reply, p. 7, and that "O.K. Sand secured key terms of their proposed agreement" (Harmon Dep., p. 141). The evidence does provide support for Martin Marietta's contention that O.K. Sand and American Aggregates were negotiating prior to Martin Marietta's termination, but a review of page 141 of Harmon's deposition does not reveal that O.K.

Martin Marietta does not present evidence that American Aggregates and Martin Marietta agreed, as part of its collusive scheme, that O.K. Sand would terminate the Martin Marietta agency, or that American Aggregates had a part in that termination. To the contrary, the unrebutted evidence is that, according to Harmon, American Aggregates was "sensitive from a professional, from an ethical standpoint of interfering in something that our competitor was involved in" and not interested in "having any effect upon the breaking of this [O.K. Sand/Martin Marietta] agreement...." Harmon Deposition, p. 115. Martin Marietta has thus failed to present "evidence that tends to exclude the possibility of independent action by the manufacturer and distributor." *Monsanto*, 465 U.S. at 768, 104 S.Ct. at 1472-73.

Perhaps the reason Martin Marietta has experienced such a difficult time producing evidence to support its claim is that Martin Marietta has had to stretch and twist its "lost profits" claim to fit the description of an antitrust injury referenced in *Monsanto* and *Murray Biscuit.* In those cases, the distributor was terminated when it refused to conspire and price-fix with its fellow distributors. Martin Marietta, however, has not claimed that it was one distributor among many who was terminated for failing to price-fix, nor has it presented evidence to establish that O.K. Sand ever approached or requested that Martin Marietta engage in illegal price-fixing. Martin Marietta has presented no evidence to indicate that, even if O.K. Sand and American Aggregates later engaged in price-fixing, O.K. Sand terminated Martin Marietta as part of and pursuant to that price-fixing scheme.

*III. Conclusion*

Accordingly, for the reasons stated above and in the Court's previous entry which are now incorporated herein, the Court concludes that Martin Marietta has failed to present evidence to create a genuine issue of material fact concerning whether O.K. Sand terminated its agency agreement with Martin Marietta as part of a conspiracy to price-fix with American Aggregates. The motions to re-

Sand and American Aggregates had agreed on

consider prompt the Court's affirmance of its prior orders.

It is so ORDERED.

any agency terms, "key terms" or not.